UNITED STATES of America,
Appellee,

v.

James Michael GIULIANO, Appellant.
No. 15973.

United States Court of Appeals
Third Circuit.

Argued May 25, 1967.

Decided Aug. 31, 1967.

Thomas F. Campion, Jr., Shanley & Fisher, Newark, N. J., for appellant.

David M. Satz, Jr., U. S. Atty., Newark, N. J. (Don Allen Resnikoff, Asst. U. S. Atty., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

Appellant was convicted under 18 U. S.C. § 472 for the sale and possession of counterfeit United States Federal Re-serve Notes on or about June 23, 1965 and for the possession of counterfeit United States Federal Reserve Notes on or about September 21, 1965.

The witnesses on behalf of the Government consisted of four Secret Service agents and Messrs. DeRose and Joya who are characterized as informers. There was no evidence offered on behalf of the defendant.

The first witness in the Government's case was DeRose. He testified that he sold counterfeit money in October 1964 for which offense he was arrested in December 1964. He said he was arrested again in February 1965 for selling counterfeit money in December 1964. He was asked:

"Q. And from whom did you purchase the money that you were arrested for selling?" He answered, "Giuliano".

He identified "Giuliano" in the courtroom as appellant.

DeRose stated that on the evening of June 23, 1965, with his partner Joya, he met Secret Service agents Szpak and Martin and " * * * I told them I had information you know, for some new counterfeit bills. * * * Well, we explained to them that we could get some new ten dollar bills. Q. From whom? A. Giuliano. Q. Who is Giuliano? A. The defendant over there (indicating). Q. The defendant over here (indicating)? A. Yes. The Court: Indicating the defendant." Joya was given $120 by the agents with which to purchase $1,000 of "Bogus tens". DeRose and Joya met Giuliano that same evening and the three arranged that Giuliano " * * bring down $1,000 of tens." A little later, according to DeRose, he and Joya met Giuliano. The latter agreed to give DeRose, the $1,000 of counterfeit ten dollar bills for $110. DeRose took $110 from Joya, gave it to Giuliano who in turn gave DeRose the $1,000 of counterfeits which DeRose turned over to Joya. After that at DeRose's house DeRose gave the counterfeit money to the agents. Sometime in the following July, as De-

Rose testified, he and Giuliano had an arrangement to meet for the purpose of DeRose buying more counterfeits from Giuliano. The latter appeared at the meeting place in his automobile but said DeRose in answer to the question, "And did you meet with him?" "No, he seen the two agents and he kept going." De-Rose met Giuliano next on September 21, 1965 and "Well, made arrangements to purchase some more money." Giuliano came to DeRose's house later that night. DeRose asked him "Do you have the money?" He said, " 'Yes' and he made a motion to give it to me." I said "Wait a minute. The law is here, get out of here. So he took off, and I turned around and went right to the house, me and Joya."

Tristan Joya corroborated DeRose respecting the transaction with Giuliano on June 23, 1965 and the meeting with Giuliano on September 21, 1965. He testified that Giuliano had counterfeits on him on September 21, 1965. Asked how he knew that he said "He told us that he had it and he—he pointed to them in his pocket."

Agent Szpak, as a witness, said he saw and heard the June 23, 1965 incident and substantiated the accounts of DeRose and Joya concerning it. With respect to September 21, 1965 he stated that DeRose advised him on that day that Giuliano had counterfeit money to sell. Szpak told the Assistant District Attorney in charge of the matter about this and was authorized by him to prosecute Giuliano. In accord with that he signed a complaint and obtained an arrest warrant. That night when Giuliano came out of DeRose's house and entered his automobile, agent Szpak arrested him. As he did, Giuliano threw a bundle out of side window of his car. Agent Rush retrieved that and turned it over to Szpak. The bundle was identified by the witness and contained approximately $2,000 of counterfeit ten dollar bills which were marked in evidence. Agent Rush who was present in the area of the DeRose house on the night of September 21st saw Giuliano throw the package out of his car, picked it up and gave it to Szpak. He identified

the package in court. Agent Bechtle saw a meeting between Giuliano, DeRose and Joya earlier on the evening of September 21st. Agent Martin who was in charge of the detail was with agent Szpak on the night of June 23rd and largely corroborated the Government witnesses as to the meeting of DeRose and Joya with Giuliano, etc. He said that Giuliano was not arrested at the same time as the above stated arrests of DeRose and Joya because "We had a continuing investigation regarding Mr. Giuliano, we had other avenues of investigation regarding Mr. Giuliano and were seeking to get further corroboration of his guilt other than just the word of two defendants."

Following the defense trial pattern, there was no attempt in the summation for the defendant to dispute the facts as such which were testified to in the Government proofs. As to the latter the defendant's attorney merely attempted to attack the credibility of the Government witnesses. In summation he specifically told the jury that the defendant had not testified; he advised the jury that the defendant had the right to take that position and that the Court would so instruct the jury. The attorney said:

"I want to at this time make note of the fact, and I know you are possibly concerned with the fact that the defendant did not take the stand. *This honorable Court will tell you in so many words that the law does not compel a defendant in a criminal case to take the witness stand and testify.* And no presumption of guilt may be raised and no inference of any kind may be drawn from the failure of a defendant to testify. I wanted to satisfy your minds on that point because it possibly was bothering you." (Emphasis supplied.)

The trial judge did later explicitly so charge the jury saying:

"Now, in this particular case the defendant did not take the stand. I charge you that that is his right; it is not a privilege, it is a right, a right

that's guaranteed to him by our system of jurisprudence. The fact that he did not take the stand may not be used by you in any respect or to any degree in drawing any inference unfavorable to him. He stands here accused of certain offenses to which he has pleaded not guilty, and there is no obligation for him to take the stand, nor may you draw any inference from his failure to take the stand which is unfavorable or adverse to his interests."

In the face of the above the argument is here advanced that the district attorney in summation "must be held to have [made] prohibited comment on defendant's failure to testify." This is the only point in the appeal that warrants discussion. It should be noted parenthetically that there was no objection to the complained of statements when they were made.

The Government summation opened with reference to the defense attempt to try the Government witnesses instead of the defendant. In speaking of the presumption of innocence the defense attorney said:

" * * * every person charged with the commission of a crime is presumed to be innocent *until proven guilty beyond a reasonable doubt.* Now, the presumption of innocence attaches to a defendant *and covers him like a cloak from the beginning of the trial until the very end of the trial, until you finish with your deliberation.*" (Emphasis supplied.)

As to this the district attorney told the jury:

"And it is very true that that defendant over there has a cloak of innocence on him until all innocence is removed and he is found to be guilty beyond a reasonable doubt: that you will hear from Judge Meaney when he charges the jury.

"But like all garments, that cloak, as far as I am concerned, and you are the sole judges of the facts, has been removed, and it was removed a long time ago in this short period of the trial,

because no matter what has been said, comments and so on, the evidence that has been brought to you by the people who have testified cannot be refuted as to the essential ingredients of what took place on June 23, 1965 and again on September 21st.

"You have heard various agents testify in addition to Mr. DeRose and Mr. Joya as regards what they saw and what they did. From the uncontradicted Government testimony, there was no difference between them, that as far back as December, 1964, when Tony DeRose was picked up, that Mr. Giuliano had sold him notes."

In the above entire context it is clear that the Government is demonstrating that there is no contradiction between the evidence of DeRose and Joya and that of the Secret Service agents. The prosecution argument strongly supported the credibility of DeRose and Joya which in the then just concluded defense summation had been once more bitterly attacked.

Later in his summation the district attorney continued with his exposition of the evidence as indicating that DeRose and Joya were telling the truth. He recalled the testimony of the agents that they had been enabled to observe Giuliano with DeRose and Joya because of the opportunity given them by the latter two. And in discussing the evidence by DeRose and Joya and their criminal background he said:

"So that when we learn that these persons have a record, fairly extensive, we know that what took place did in fact take place because we are not only relying on the testimony of the witnesses DeRose and Joya alone, you heard several other agents corroborate what these persons who were involved in this crime have stated, and it can't be refuted that on June 23rd and September 21st Mr. Joya and Mr. DeRose met with Mr. Giuliano, with the money, genuine money that was given to them by the Government, no question about that, furnished to Mr. Giuliano, who in

turn gave it to DeRose and Joya, who in turn gave to the Government agents, the counterfeit, phony money."

In this instance the district attorney argued that the corroboration by the agents of the substance of the evidence of DeRose and Joya indicated that it is the truth. And he urged that the matter of course testimony of the agents to the effect that the genuine Government money to purchase the counterfeit was given by them to DeRose and Joya whom they saw give it to Giuliano who in turn gave his counterfeit money (marked in evidence at this trial) to DeRose and Joya could not be reasonably refuted. The district attorney was not talking about the defendant not taking the stand. He knew as well as the judge and the defense lawyer that the defendant had the right not to testify. He was talking about his sound affirmative case; the authentic ten dollar bills the agents had originally; the counterfeit money which they finally received and how the first was delivered to Giuliano and how the second came into their possession. In the factual posture developed during the trial it is doubtful if the irrefutability of that evidence was overstated, certainly it dealt with the Government's affirmative position and not with some completely stupid trick of advising the jury that the defendant had not testified in his own behalf. His own lawyer had reminded the jury of exactly that same thing; had further told the jury that the judge would instruct it that the defendant had the unquestionable right to remain silent. That mandatory instruction was scheduled to and did immediately follow the district attorney's talk. From all of the above we are satisfied that there was no comment by the district attorney about defendant's failure to testify.

Most of what has been said above relates to the final assertion on this point. It too is based on the district attorney's determined effort to defeat the defense tactic of persuading the jury to try DeRose, Joya and the agents instead of the defendant. Referring to the above essential evidence in the trial in alluding to the defense summation the district attorney said:

"And he also forgets that what is charged in the indictment in fact took place and cannot be refuted. It takes a thief to catch a thief. This is an essential problem of law enforcement.

We don't like to harbor thieves, but people just don't come up and say, 'I committed a crime.' And one of the valuable ways to do it when a crime is found to have been committed is to get people who are involved in it to make some types of confession and get others; that's essentially what happened. It was no romance.

"You heard the agents testify, you heard DeRose and Joya testify as to these facts. They made the contact with the agents, they were the ones that provided the essential information, and here was a man, as was testified this morning, Mr. Martin, who was in charge of the overall office in counterfeiting, that Mr. Giuliano was known to be involved in this area, and they just didn't want to catch him on one offense, they felt there were other leads that needed to be followed. This is why you don't make an arrest every time someone does anything like that."

■ Once more it is apparent that the district attorney was talking about his proofs, was explaining the necessity in the sort of circumstances before the jury to obtain if possible, people associated with the type of crime involved and if possible, with the particular crime, to tell what they know of the offense. The district attorney went on to show how DeRose and Joya had been of indispensable help in the case and why their testimony was believable. He used the expression "It takes a thief to catch a thief." DeRose and Joya at the trial had admitted past criminal records. The district attorney as an advocate was entitled to his considered view of the evidence. He thought it properly proved Giuliano guilty under the indictment. We

do not see any substantial error in his use of the aphorism.

Appellant suggests that this question is controlled by our decision in Linden v. United States, 296 F. 104 (3 Cir. 1924). The apprehension and arrest there occurred at night out in a stream. The only persons present were the three defendants and the two customs officers. The latter were prosecution witnesses. The Court said p. 106: "It follows, therefore, that the only persons who could possibly contradict their testimony were the defendants themselves." From these facts we are satisfied that Linden has no application because in our problem the district attorney in the questioned parts of his summation was palpably not pointing to the defendant but to his own evidence. The Linden circumstances were also significantly different from those before us. In Linden there was no possible contradiction of the prosecution evidence except by the defendant. In this appeal the episodes occurred on the public streets of a large city. The possibility of witnesses other than those produced by the Government was never actually eliminated. See also our opinion by the same panel as in Linden, in Slakoff v. United States, 8 F.2d 9 (3 Cir. 1925).

Judge Hastie's opinion for this Court in United States v. Heitaus and Selikoff, 3 Cir., 377 F.2d 484, 486 is very much in point. The last paragraph thereof reads:

"The gratuitous demeaning of a criminal defendant's case by inviting a jury to draw an unfavorable inference from his failure to testify is proscribed as 'a penalty * * * imposed * * * for exercising a constitutional privilege'. Griffin v. State of California, 1956, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. But that is not what occurred here. By deliberate choice the defense focused attention upon the credibility of certain witnesses for the prosecution and urged the jury to disbelieve them. The prosecutor then did no more than rebut this attack upon his evidence by reminding the jury in general terms that the testimony in question was uncontradicted and unimpeached. Such comment was a fair rejoinder that had been invited by the defense. If some juror was thus reminded that the defendant had not testified, the court's subsequent instruction concerning the jury's duty to disregard the failure of the accused to testify minimized the risk of inferring guilt from such failure. On the facts of this case, the defendant was entitled to no more. Cf. United States v. Johnson, 4th Cir., 1964, 337 F.2d 180, aff'd. on other grounds, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681; Knowles v. United States, 10th Cir., 1955, 224 F.2d 168."

■ Appellant also asserts that the trial Court erred in failing to deliver defendant's request to charge on the issue of entrapment. The Court held as a matter of law that there was no evidence of entrapment in this trial. Our independent and exhaustive study of the trial record confirms the rightness of that decision.

The final contention on behalf of appellant has to do with a question on redirect asked of agent Martin. The latter had testified on cross-examination that Giuliano was not arrested on June 23, 1965. The defense developed this as follows:

"Q. But then you allowed Giuliano to leave, did you not?

A. No, I did not.

Q. You didn't place him under arrest?

A. No, sir.

Q. Did you have reason to believe that he had this mixture of twenties and tens, $120 on his person?

A. Yes, sir.

Q. But you didn't place him under arrest?

A. No."

The district attorney on redirect asked why Giuliano was not arrested. This was objected to, the Court queried,

"Did you have a reason?" The answer was "Yes". The Court asked "What was the reason?" The answer was:

"We had several. We had a continuing investigation regarding Mr. Giuliano, we had other avenues of investigation regarding Mr. Giuliano, and we were seeking to get further corroboration of his guilt other than just the word of two defendants."

We find no error arising out of this point.

We express the sincere thanks of the Court to the assigned attorney for appellant for his thorough, most competent representation of appellant.

The judgment of the District Court will be affirmed.