## LITTREAL v. REDWINE

[No. 140, September Term, 1968.]

*Decided March 12, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Stanley M. Dietz* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *Arthur A. Marshall, Jr.,* and *James Fannon, State's Attorney* and *Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Appellant (Littreal) chose to defend this paternity proceeding [1] by accusing appellee of having been the sweetheart, not of Sigma Chi, but of officers of the 9th Precinct of the Washington Metropolitan Police Department. Since that defense was unsuccessful he has appealed. His assignment of error arises out of counsel's [2] "comment to the jury in closing argument" in respect of his "failure to testify" [3] and the subsequent refusal of the trial judge, Meloy, J., to declare a mistrial.

The case came on for trial in the Circuit Court for Prince George's County before Judge Meloy and a jury in May 1968. In his opening statement counsel for appellee told the jury he would show that, after 10 years of marriage and the birth of three children, she became separated from her husband in February 1964, that shortly thereafter she became Littreal's mistress, that as a result of their liaison twins (one of whom survives) were born in September 1965, and that in August 1967 she gave birth to another child. Appellee and her mother so testified. No testimony or other evidence was offered by Littreal.

We have set forth the following excerpt from the opening statement of counsel for Littreal:

> "Madam juror and gentlemen of the jury, on behalf of the defendant we hope to show you that after this lady, Mrs. Redwine, separated from her husband in 1964 she took up with a series of young gentlemen, any one of which could have been the father of these children. We will show you that she was living with a man—and I mean living with him as husband and wife, not as brother and sister — by the name of Bubby

---

1. Code, Art. 16 § 66A, et seq. (1966 Repl. Vol.)
2. *Id.* § 66C
3. *Id.* § 66F (d)

Watts. We will show you that she had an affair with a police officer in No. 9 Precinct by the name of R. D. Green, and actually this man Green was the one she really separated from her husband over. We will show you that she also had an affair with another police officer from No. 9 Precinct in Washington by the name of Howard Hossler, and that in between those times she had an affair with a man named Gene Sales, she had an affair with a carpenter by the name of Johnny Hubbard, she took on two brothers named Bobby Kersey and Harry Kersey and she also finished up with a fellow named Ken Gabrielson, who was also a police officer from No. 9 Precinct.

"We will show you that this is an attempt by this lady to attempt to—well, I wouldn't use the term blackmail—but force extortion, to force Mr. Littreal to pay for these children, pay her support for these children, and Mr. Littreal, who is also a policeman from No. 9 Precinct in Washington, D. C., has been subjected by this lady, we will show you, to prosecution in the District of Columbia where she attempted to have him lose his job over this."

What follows is from the closing argument of counsel for appellee:

"There have been a lot of men who have been named here. Mrs. Redwine freely admits that she either knew them or went for a ride with one, or casually knew who they were. They were all somehow attempted to be connected with this, but we haven't seen any of them in here. And apparently it is not too difficult to find them because apparently, by her own testimony the ones that she knew were local people, they seemed to be rather local people, and not one of them has come in here to take the stand to say that, yes, he did know her in a more intimate way than the petitioner has testified to.

"So what have we really got in this case? We have got a situation where we have the petitioner here who

did indeed have an affair, if you want to call it that, with Mr. Littreal. Her husband was not around and during the time that she was having the affair she became pregnant, pregnant by the person, the one person that she was having sexual relationships with at that time, Mr. Littreal. *And there is no testimony to contradict that.*" (Emphasis added.)

Before proceeding with his closing argument counsel for Littreal moved for a mistrial. Although counsel for appellee exhibited a willingness to "concede * * * to a mistrial," Judge Meloy, correctly we think, denied the motion. The jury found Littreal to be the father of the surviving twin and the child born in August 1967.

Littreal, in his brief, relied entirely on *Griffin v. California,* 380 U. S. 609 (1965). At argument he cited *White v. United States,* 248 A. 2d 825 (D. C. Mun. App. 1969), decided 8 January. In our judgment neither decision is persuasive here. In *Griffin* the petitioner was convicted of murder in the first degree by a California jury in a trial in which he did not testify. The court imposed the death penalty. He had been seen with the victim the evening before her death in the alley where her body was found. In argument to the jury the prosecutor said:

"'The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.

"What kind of a man is it that would want to have sex with a woman that beat up if she was beat up at the time he left?

"He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. He would know how long he was with her in that box. He would know how her wig got off. He would know whether he beat her or mistreated her. He would know whether he walked away from that place cool as a cucumber when he saw Mr. Villasenor because he was conscious of his own guilt and wanted to get away from that damaged or injured woman.

"These things he has not seen fit to take the stand and deny or explain.

"And in the whole world, if anybody would know, this defendant would know.

"Essie Mae is dead, she can't tell you her side of the story. The defendant won't." *Id.* at 610-11.

Despite the provision in the California Constitution, Art. I § 13, which permits such comment, the Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615. Of course, the statement of the California prosecutor, were it uttered in a court of this State, would likewise be proscribed. *Smith v. State,* 169 Md. 474, 182 A. 287 (1936). The comment in the case at bar, however, is a horse of quite another shade. In *United States v. Johnson,* 337 F. 2d 180, 203 (4th Cir. 1964), *aff'd and remanded,* 383 U. S. 169 (1966), it was said:

"Edlin claims that the prosecutor improperly commented on his failure to take the stand. The incident referred to occurred at the end of the Government's closing summary to the jury. After pointing out asserted inconsistencies in the appellant's positions, the prosecutor spoke these words:

'Members of the Jury, the defendant Edlin *has presented no defense in this case. He has presented no evidence to contradict the charges against him. He has produced no evidence to deny numerous statements* made by many, many government witnesses. *He has produced no evidence to deny the testimony of numerous witnesses of his various activities* which clearly indicate beyond any doubt, Members of the Jury, his guilt of the charges in this indictment.' [Emphasis added.]

"In *Davis v. United States,* 279 F. 2d 127 (4th Cir. 1960), a similar argument was presented. The answer we gave applies with equal force here:

'The United States Attorney's argument cannot be said to have constituted a forbidden comment on the failure of the defendants to testify. He merely reviewed certain testimony and added, truthfully, that there was no evidence in contradiction.'

"The prosecutor did not draw improper attention to Edlin's refusal to testify. He merely pointed out that the defense did not introduce evidence to contradict certain of the prosecution's witnesses. *Edlin was not the only person who could have refuted the Government's witnesses. Leathers v. United States,* 250 F. 2d 159, 165 (9th Cir. 1957). The prosecutor addressed himself to the absence of any thing in the record to contradict the Government's version of the case. Under these circumstances his comment was not improper. *Davis v. United States, supra; Garcia v. United States,* 315 F. 2d 133, 137 (5th Cir. 1963)." (Emphasis added.)

To the same effect *see King v. State,* 190 Md. 361, 58 A. 2d 663 (1948) ; *United States v. Day,* 384 F. 2d 464 (3d Cir. 1967) ; *United States v. Giuliano,* 383 F. 2d 30 (3d Cir. 1967) ; *Miller v. State,* 224 A. 2d 592 (Del. 1966).

In *White v. United States, supra,* the defendant, convicted by a jury of assault, offered no evidence at the trial, nor did he testify. During final argument the prosecutor commented as follows :

" 'Who struck the first blows in this case after the defendant was arrested? Mr. White struck the first blows. That was the testimony of the two police officers. *You have heard nothing to the contrary.'* (Emphasis supplied.)

"He also said during his rebuttal argument :

" 'The case really is one of credibility. Do you believe the police officers? I see no reason why you shouldn't believe the police officers. *There has been no testimony to the contrary.'* (Emphasis supplied.)" *Id.* at 825.

668

It was established in the Government's case that the defendant was the only person who could have contradicted the testimony of the two police officers. The court held that the prosecutor's comments, in the circumstances, "clearly called the jury's attention to the fact that the appellant [defendant] had not testified and [that] * * * such comments were improper and prejudicial." How different is the situation in the case at bar! Here Littreal's counsel announced with rather startling precision that he would prove appellee had lain with Bubby Watts, R. D. Green, Howard Hossler, Gene Sales, Johnny Hubbard, Bobby Kersey, Harry Kersey and Ken Gabrielson. Except for an isolated tumble with Hossler, which she recalled took place on New Year's Day 1965, she denied having had anything to do with any of them. Presumably all of these men were known to Littreal; indeed, Green, Hossler and Gabrielson were fellow officers assigned to Precinct No. 9, yet none of them was produced as a witness. We think the applicable law was correctly stated in *United States v. Johnson, supra.* The statute[4] prohibits comment or reference "with respect to defendant's failure to testify" and it seems obvious to us that counsel's comment in the trial below was aimed, not at Littreal's failure to testify, but at his failure to produce the witnesses promised in the opening statement.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*