76 A.3d 458

**William Siam SIMPSON, III**

v.

**STATE of Maryland**

**No. 2833, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 25, 2013.

338

340

John C. Belcher, Oxon Hill, MD, for appellant.

Ryan R. Dietrich (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., GRAEFF, and HOTTEN, JJ.

HOTTEN, J.

On June 30, 2010, William Siam Simpson, III, appellant, was indicted in connection with three incidents of arson occurring on November 15, 2009, April 4, 2010, and May 16, 2010. Specifically, those offenses included the following counts: (a) two counts of first-degree arson; [1] (b) one count of second degree arson; [2] (c) one count of first-degree burglary; [3] (d)

---

1. Section 6–102 of the Criminal Law Article, entitled, "Arson in the first degree," in relevant part, states:

 (a) *Prohibited.*—A person may not willfully and maliciously set fire to or burn:
 (1) a dwelling; or
 (2) a structure in or on which an individual who is not a participant is present.
 (b) *Penalty.*—A person who violates this section is guilty of the felony of arson in the first degree and on conviction is subject to imprisonment not exceeding 30 years or a fine not exceeding $50,000 or both.
 Md.Code (2002, 2012 Repl.Vol.), §§ 6–102(a) & (b) of the Criminal Law Article.

2. Section 6–103 of the Criminal Law Article, entitled, "Arson in the second degree," in relevant part, provides:

one count of third-degree burglary; [4] (e) one count of fourth-degree burglary; [5] and (f) four counts of reckless endangerment.[6] After a three-day trial concluding on January 13, 2011,

---

(a) *Prohibited.*—A person may not willfully and maliciously set fire to or burn a structure that belongs to the person or to another.

(b) *Penalty.*—A person who violates this section is guilty of the felony of arson in the second degree and on conviction is subject to imprisonment not exceeding 20 years or a fine not exceeding $30,000 or both.

Md.Code (2002, 2012 Repl.Vol.), §§ 6–103(a) & (b) of the Criminal Law Article.

3. Section 6–202 of the Criminal Law Article, entitled, "Burglary in the first degree," sets forth:

(a) *Prohibited.*—A person may not break and enter the dwelling of another with the intent to commit theft or a crime of violence.

(b) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment not exceeding 20 years.

Md.Code (2002, 2012 Repl.Vol.), § 6–202 et seq., of the Criminal Law Article.

4. Section 6–204 of the Criminal Law Article, entitled, "Burglary in the third degree," provides:

(a) *Prohibited.*—A person may not break and enter the dwelling of another with the intent to commit a crime.

(b) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the third degree and on conviction is subject to imprisonment not exceeding 10 years.

Md.Code (2002, 2012 Repl.Vol.), §§ 6–204 *et seq.*, of the Criminal Law Article.

5. Section 6–205 of the Criminal Law Article, entitled, "Burglary in the fourth degree," in relevant part, states:

(a) *Prohibited—Breaking and entering dwelling.*—A person may not break and enter the dwelling of another.

(b) *Prohibited—Breaking and entering storehouse.*—A person may not break and enter the storehouse of another.

\*　　\*　　\*

(e) *Penalty.*—A person who violates this section is guilty of the misdemeanor of burglary in the fourth degree and on conviction is subject to imprisonment not exceeding 3 years.

Md.Code (2002, 2012 Repl.Vol.), §§ 6–205(a), (b), & (e) of the Criminal Law Article.

6. Section 3–204 of the Criminal Law Article, entitled, "Reckless endangerment," in relevant part, states:

(a) *Prohibited.*—A person may not recklessly:

and one day of deliberation, the circuit court accepted a partial verdict, finding appellant not guilty of one count of reckless endangerment. Thereafter, the court declared a mistrial on the remaining nine counts.

A new trial was held on the remaining counts from July 12, 2011, until July 14, 2011. On July 15, 2011, the court accepted a partial verdict—finding appellant guilty of attempted second degree arson—and declared a mistrial on the remaining counts. Appellant subsequently filed a motion for new trial on the basis of what appellant considered prosecutorial misconduct, in violation of appellant's rights under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights, which the circuit court denied on January 27, 2012. Appellant was sentenced to ten years of incarceration, with all but two years suspended, followed by a period of probation.

Appellant noted a timely appeal on February 6, 2012. Appellant presents two questions for our review:

I. Did the prosecutor violate Simpson's rights under the Fifth Amendment [of the United States Constitution] and Article 22 of the Maryland Declaration of Rights by repeatedly assuring the jury during opening statement that Simpson "will tell you" that he committed the alleged offenses[?]

II. Did the trial court err by permitting the State to offer opinion testimony from a fire investigator concerning his canine partner's alleged detection of an accelerant on and in Simpson's car and on his shoes?

For the reasons that follow, we shall affirm.

-------

(1) engage in conduct that creates a substantial risk of death or serious physical injury to another; or

\*　　　\*　　　\*

(a) *Penalty.*—A person who violates this section is guilty of the misdemeanor of reckless endangerment and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.

Md.Code (2002, 2012 Repl.Vol.), §§ 3–204(a)(1) & (b) of the Criminal Law Article.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On November 15, 2009, Jeffrey Byers ("Mr. Byers"), his wife, Yolanda Byers ("Ms. Byers"), and their daughter, Jenaigh Byers ("Jenaigh"), returned to their home on Sandy Bar Drive, Fort Washington, Prince George's County, Maryland, at approximately 1:00 a.m. Mr. Byers noticed flickering lights shining through his window blinds and thought it was "like a fire engine, a police truck, or something." He walked over to his bedroom window to determine the source of the lights, and "saw fire coming out of the front of [his detached, two-car] garage" and its three-bedroom loft. He yelled to his family, alerting them of the fire, and proceeded to telephone the fire department.

Thereafter, Mr. Byers ran outdoors, grabbed his garden hose, and attempted to contain the fire by "spraying it down." Unfortunately, the garage was engulfed by the blaze, and he soon realized that "the fire[,] at that point[,] was too much for the water hose." Nonetheless, Mr. Byers attempted to prevent the fire from spreading to his family's home. The firemen arrived and asked him to move to a more secure location. Following their advisement, the firemen began spraying down the Byers' residence. Confused, Mr. Byers' asked, "why, and [one fireman] said because the garage was pretty much already a loss," and the firemen "wanted to cool down the main house . . . to keep the fire from spreading."

By the time the fire was extinguished, there was little left of the garage's structure. All of the family's personal property stored within the garage was a total loss. Because the cause of the fire appeared suspicious, the police were called for further investigation. Mr. and Ms. Byers provided the police a list of potential suspects. In addition, Investigator William Murray of the Prince George's County Fire Department's Office of the Fire Marshal, an active member of the International Association of Arson Investigators, conducted an investigation of the charred structure in the fire's aftermath. After assessing the damage to the property and determining the

fire's origin, he concluded within a reasonable degree of certainty that the fire "was set by human hand." As a result, the Fire Department installed surveillance cameras in the area around the Byers' home, but subsequently removed them on April 3, 2010.

On April 4, 2010, Mr. Byers awoke around 3:00 a.m., and discovered the home was filled with smoke. Concerned for the safety of his family, he proceeded to determine the origin of the smoke, then exited the home to inspect its perimeter. Upon reaching the backside of the home, he "saw the roof above [the] dining room on fire in two places." Mr. Byers "yelled back" to Ms. Byers, informing her of the fire, and they "started calling 911." Mr. Byers then "ran to get the water hose, and ran . . . to the back of the house," and attempted to extinguish the fire. Fortunately, he was able to contain the fire until the Fire Department arrived to extinguish the flames. Lieutenant Brandon Goff of the Office of the Fire Marshal responded to the scene, and detected the strong smell of accelerant in the air. Mr. and Ms. Byers provided law enforcement officers and the fire investigator with an additional list of possible suspects.

Law enforcement officers collected several samples of burned wood, soil, and debris as well as partially burned tar paper and pieces of roofing for testing. They also collected an unburned sample of roofing as a control sample for testing. Forensic Chemist Andrew Hawkins of the Bureau of Alcohol, Tobacco, Firearms and Explosives analyzed the samples for ignitable fluids, and determined that all provided samples, but for the control, contained gasoline.

Following the fire of April 4, 2010, the Byers family replaced the two-camera surveillance system they originally used at their residence with an "eight-camera system that ha[d] a built-in DVR." Mr. Byers purchased an additional four cameras for the system, resulting in a twelve-camera surveillance system that monitored the entire perimeter of the Byers' residence. The system was equipped with infrared motion detection and recording capabilities that enabled the Byers to

remotely survey the home. Additionally, Mr. and Ms. Byers began sleeping in shifts to monitor the security of their home.

During Ms. Byers' shift on May 16, 2010, at approximately 1:00 a.m., she noted on the surveillance cameras' footage, that "all of a sudden, someone started walking down the street, alongside [the Byers'] yard, and then . . . [she] watched [that person] take a left turn into [their] driveway." The individual was wearing a mask, hood, jacket, jeans, a pair of tennis shoes, and carried a container. Ms. Byers then witnessed the individual approach her Nissan Altima vehicle and begin "dous[ing]" it with an unknown liquid. She then alerted her husband.

Jenaigh Byers also maintained a monitor of the surveillance system in her bedroom. After witnessing the same events as her mother, Jenaigh exclaimed, "It's a man, there's a man!" Jasmine Byers, Mr. and Ms. Byers' other daughter was awakened by the family's commotion. The entire family proceeded to the living room, which maintained a picture window facing the driveway, and Ms. Byers began pounding on the window, shouting to the man, "Get away from the car, get away from my car[!]" In response, the man stepped into the Byers' yard and gestured to Ms. Byers with a middle-finger. As the family dialed the police, the man retreated, initially dropping a bag and the container with which he was pouring liquid onto Ms. Byers' vehicle. He subsequently picked up the articles and fled from the Byers' property, running "back off up the street."

As the family waited, Mr. Byers, Ms. Byers, and Jasmine realized that the man who had attempted to ignite Ms. Byers' vehicle was appellant, Jasmine's former boyfriend from high school, based on the man's posture, walk, and body frame. When the police arrived, the family provided the officers with appellant's name, indicated that he lived within a five to ten minute drive of the Byers' residence, and provided the officers with appellant's address.

Captain Brian Radinsky ("Captain Radinsky") of the Prince George's County Fire Department and EMS, spoke to police

officers at the Byers' residence and observed that Ms. Byers' vehicle had, in fact, been doused with gasoline. He subsequently viewed the surveillance footage and was provided with appellant's address. Thereafter, he, along with his partner Robert Kaleda ("Investigator Kaleda"), drove to appellant's address located on Surrey Circle Drive, Fort Washington, Prince George's County, Maryland. Captain Radinsky spoke to police officers already there and observed Investigator Kaleda perform an exterior canine scan of the appellant's vehicle. Investigator Kaleda's canine partner, Joy, had two positive alerts to the presence of accelerants: (1) at the driver's door handle, and (2) at the trunk's keyhole.[7]

After witnessing Joy's alert, Captain Radinsky, along with two police officers, knocked on appellant's door. Appellant answered, "and he asked what was going on." As Captain Radinsky and the two officers walked inside, they smelled a strong odor of gasoline. Captain Radinsky placed appellant under arrest. Appellant subsequently consented to a canine search of his person, and a canine and physical search of his vehicle. Although no inculpatory evidence was found on the appellant's person, Joy alerted to the presence of accelerants in appellant's trunk and underneath the driver's seat of appellant's vehicle.

Appellant and his father, William Siam Simpson, Jr., also consented to a canine search of his bedroom and the laundry room. During the canine search of appellant's bedroom, Joy alerted to a pair of black and gray Nike brand athletic shoes located in the appellant's closet. Inspector Kaleda collected the shoes, placing them each individually in one-gallon cans for forensic laboratory analysis.[8]

---

**7.** When Joy receives a command to seek out the presence of accelerants, she sniffs the area to determine if the odor is present. When she finds the highest concentration of the odor, Joy sits and puts her nose on the area of highest concentration. *See* Part III(B), *infra*, for more detail.

**8.** Forensic Chemist Andrew Hawkins of the Bureau of Alcohol, Tobacco, Firearms and Explosives performed a gas chromatography-mass

En route to transporting appellant to the District IV Oxon Hill police station, appellant blurted out to Captain Radinsky that he did not understand what was going on and that "he had been out earlier that night on a date." Appellant then asked Captain Radinsky "if [he] wanted to see text messages to who[m]ever he was on a date with, to prove it." Captain Radinsky advised appellant that they could discuss it after their arrival at the station.

At the police station, appellant was placed in an interview room and advised of his *Miranda*[9] rights. He subsequently

---

spectrometry for the presence of ignitable liquids on both shoes. The results from both shoes indicated the presence of gasoline. *See* discussion of Mr. Hawkins testimony at trial, *infra*.

9. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), providing:

.... We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws. However, unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed.

At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere.... Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

\* \* \*

The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

.... the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today.

executed an advice of rights and waiver form, and was instructed before answering any questions that the Byers' had a video surveillance system. Appellant admitted that he had poured gasoline on Ms. Byers' vehicle and was going to ignite it with a lighter in his front right pocket. He also admitted to burning down the Byers' garage and setting fire to the roof of the Byers' home, as reflected in the following colloquy with the captain:

[CAPTAIN RADINSKY]: What did you use to ignite the fire in the garage?

[APPELLANT]: Lighter.

[CAPTAIN RADINSKY]: On the roof?

[APPELLANT]: Lighter.

[CAPTAIN RADINSKY]: Did you have a lighter with you tonight? [APPELLANT]: Yes. In my right pocket.

[CAPTAIN RADINSKY]: Why did you set fire to the garage, house, and attempt to burn the car?

[APPELLANT]: Grudge against the family, always treated me like shit.

[CAPTAIN RADINSKY]: How did you know the family (Byers)?

[APPELLANT]: Dated Jasmine Byers for 17 months.

[CAPTAIN RADINSKY]: When did you set the fire in the garage?

[APPELLANT]: Around Nov[.] 2009, about 2am.

[CAPTAIN RADINSKY]: What did you put the gasoline in when you burned the garage?

[APPELLANT]: A big water bottle.

[CAPTAIN RADINSKY]: When did you set the roof on fire?

[APPELLANT]: A couple of months ago, middle of the night.

[CAPTAIN RADINSKY]: What did you put the gasoline in when you burned the roof?

---

*Id.* at 467–70, 86 S.Ct. 1602.

[APPELLANT]: A big water bottle.

[CAPTAIN RADINSKY]: What did you put the gasoline in when you tried to burn the Nissan?

[APPELLANT]: Metal canteen kept at house, in garage.

[CAPTAIN RADINSKY]: Did you know that the Byer's [sic] were home when you burned the roof?

[APPELLANT]: I assumed everyone was in the main house, I didn't want to kill anybody.

[CAPTAIN RADINSKY]: Where are the clothes you wore tonight when you attempted to set the Nissan on fire?

[APPELLANT]: In my room, coat is in closet.

[CAPTAIN RADINSKY]: What shoes were you wearing tonight when you attempted to set the Nissan on fire?

[APPELLANT]: Grey and black Nike shoes.

The dialogue, *supra*, was transcribed, initialed and signed by appellant.

Following this dialogue, appellant was provided with a pen and paper to write a statement. After Captain Radinsky exited the room, appellant wrote the following statement:

I[,] William Siam Simpson[,] III[,] burned the garage down of the [B]yers house. I set the fire inside the garage. I ran away and let the fire burned [sic]. I just poured gasoline all over the garage and let it burn. The second attempt was the roof that I set on fire. I just climbed up the tree pour[ed] gasoline and just left. Let the house burned [sic]. My third attempt was tonight. I wore a mask, gloves, leather jacket, [and] poured gasoline all over the [N]issan [A]ltima and tried to burn it. I'm crazy[,] and I need help. I have anger management issues[.] I cannot control myself. Put me in the chair for lethal injection. I'm ashamed of what I [have] become[.] I [have] failed my family, friends, and myself. God help me!

Appellant subsequently signed the statement, confirming that it was "true and correct to the best of [his] knowledge."

On June 30, 2010, appellant was indicted by grand jury with ten offenses in connection with the three incidents of arson,

*supra.* The State presented its case against appellant during the course of a three-day trial that concluded on January 13, 2011. After one day of deliberation, the circuit court accepted a partial verdict, finding appellant not guilty of one count of reckless endangerment. Thereafter, the court declared a mistrial on the remaining nine counts. A new trial was held on those counts from July 12, 2011, until July 14, 2011.

On July 15, 2011, the court accepted a partial verdict—finding appellant guilty of attempted second degree arson—and declared a mistrial on the remaining counts. Appellant subsequently filed a motion for new trial on the basis of alleged prosecutorial misconduct in violation of appellant's rights under the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights, which the circuit court denied on January 27, 2012. On that same date, appellant was sentenced to ten years incarceration, with all but two years suspended, followed by a period of probation. Appellant noted a timely appeal on February 6, 2012.

Additional facts will be presented *infra* to the extent they are material to the discussion below.

## II.

## DISCUSSION

### (A) THE STATE'S OPENING STATEMENT.

The trial began with the prosecutor presenting her opening statement as follows:

On November the 15th, 2009, the [appellant] came onto the Byers' property, came to their home, and set their detached garage on fire. It burned down to the ground, along with all of their personal and sentimental property inside.

And on April the 4th, 2010, the [appellant] came back to the Byers' home and set the roof of their home on fire. There were four family members home at the time. They

woke up in the middle of the night, or in the early morning hours, to a smoke-filled house and flames.

On May 16th, 2010, yet again, the [appellant] returned back to the Byers' home, and while on video surveillance poured gasoline on Mrs. Byers' car and attempted to set it on fire.

Ladies and gentlemen, I'm going to tell you up front that this is not a who-done-it case, and this is not [a] trial where the facts of how the crime was committed [are] missing, and this is not a case where motive is a mystery.

Ladies and gentlemen . . ., the [appellant] himself will tell you, number one, that he burned down that garage—

At this point, appellant's counsel noted an objection, which was overruled. The State continued by indicating to the jury that appellant would tell them how he committed the acts of arson.

Appellant's counsel presented an additional objection to this argument, which the court overruled. The prosecutor then concluded her opening statement, stating:

And further, he'll tell you why he did it.

But even with the [appellant]'s own words, the State—I will bring members of the Prince George's County's Fire Marshal's [O]ffice, and members of the Prince George's County Police Department, here to testify before you.

And they're going to sit right there in that jury box and they're going to corroborate everything that the [appellant] has said; along with the fire investigators, a forensic chemist, who is going to come in and tell you all about his analysis of the State's evidence that was collected in this case.

Ladies and gentlemen, I ask that you give this case your undivided attention, I ask that you pay close attention to what comes from that witness stand, because at the end of this trial[,] I'm going to ask you to listen to what the [appellant] has said, to listen to how his words are corroborated; and when you go back into that deliberation room[,] I'm going to ask that you come back out with a verdict of guilty on all counts.

Thereafter, the circuit court invited appellant to present opening statement to the jury. Appellant's counsel affirmatively responded, further advising his intent to present a motion before or after his closing. The circuit court suggested that appellant present his opening statement first, to which appellant's counsel acquiesced. In his opening, appellant's counsel responded directly to the prosecutor, stating:

Based on [the prosecutor's] suggestion that my client is going to state—to stand up in front of you and admit to all of the offenses, you're saying, wait a minute, that doesn't make sense, something doesn't make sense here; if he's guilty, why don't, you know, you say he's guilty and let us all go about our business.

Well, there's something that was not entirely clear from the State's opening statement, because that what she's referring to is a so-called confession that my client gave.

But if you've listened to that presentation where she said it's not a who-done-it case, we know he did it, he admitted everything; then forget it, forget about asking any questions, forget about your oath to listen to the evidence before you render a decision—because then something's gone terribly wrong, because my client, William Siam Simpson, III, sits here before you with the presumption of innocence, and it is the State's job to prove beyond a reasonable doubt that he's guilty.

And, ladies and gentlemen, until they've done that, you must assume that he's not guilty, that he is not—that he's innocent.

Let's talk about this so-called confession which the State—and I believe they even used the word. They acted like he's going to come up here and testify in front of you, as if he did all of these things.

My client, on May 16, 2010, signed a statement, and that's what [the State] was referring to. The statement referred to three incidents.

\* \* \*

If you look at this statement ... the problem is, first, that as to the ... the first two incidents—there's no evidence, other than this statement, that my client had anything to do with those incidents....

The other problem is, if you look at the statement, it is so vague that it does not have the ring of truth.

There's a law professor who I'm going to paraphrase, and I'll look at the exact quote for the closing argument, but he said that it's the hallmark of a false confession when the confession does not fit with the known verifiable facts of a crime. And that's what you have here.

＊　　＊　　＊

And bear in mind, this is a very hard case, because all of these witnesses have testified before, including our witnesses, and they've been subjected to cross-examination. They know what we're going to ask and they know our defenses....

Subsequent to the conclusion of appellant's opening statement, the circuit court excused the jury for lunch, and the following dialogue ensued:

[APPELLANT'S COUNSEL]: Your Honor, I'm going to ask for a mistrial in this case. I think that the State has ... They said my client said that this or that, talking about the statement. But that's not what he said.

I mean, to me, it's bright-line; you can't refer to a client's testimony or non-testimony. That's a Fifth Amendment right. He has a right not to testify. At the last trial we thought we'd put him on, and decided not to.

You know, this time, I'm probably not likely to put him on, and she just told them what we were going to say and—

THE COURT: Through the confession?

＊　　＊　　＊

THE COURT: The confession is admissible in evidence as to what his words are.

[THE STATE]: And those are his words, whether he takes the stand or not.

THE COURT: Well, I understand that you don't like the phrase, but your motion for mistrial is denied.

Before this Court, appellant further alleges prosecutorial misconduct. He avers that "[t]he prosecutor violated [his] rights under the Fifth Amendment [to the United States Constitution] and Article 22 of the Maryland Declaration of Rights by ... assuring the jury during [her] opening statement that [appellant] 'will tell you' that he committed" the offenses for which he was standing trial. Consequently, he argues that the circuit court erred in overruling his objection to the prosecutor's statements, for failing to provide the jury with any curative instruction, and for denying his motion for mistrial.

Conversely, the State contends that appellant's arguments are meritless for three reasons: (1) that "the prosecutor's remarks did not implicate [appellant's] rights under the Fifth Amendment or Maryland Declaration of Rights, [and] the trial court did not abuse its discretion when it overruled defense counsel's objection ...;" (2) that the prosecutor's comments were not improper, and the circuit court committed no error in denying appellant's motion for mistrial; (3) that "[e]ven if the prosecutor's statement[s] could be interpreted to be a comment 'upon [appellant's] ultimate decision not to testify,' any such error in overruling defense counsel's objections [and in denying defense counsel's motion for mistrial] was harmless in light of the nature of the statement[.]" We find the State's arguments more persuasive.

### (B) THE PRIVILEGE AGAINST SELF-INCRIMINATION.

At the outset, we begin with a brief discussion regarding the privilege against self-incrimination. The Court of Appeals has acknowledged that "[c]omment upon a defendant's failure to testify in a criminal trial was prohibited in Maryland [long] before the United States Supreme Court['s]" decision in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which "held that the federal constitutional right against compelled self-incrimination prohibits

prosecutorial comment on the accused's silence or failure to testify." *Smith v. State ("Smith II")*, 367 Md. 348, 353, 787 A.2d 152 (2001). *See also King v. State*, 190 Md. 361, 374, 58 A.2d 663 (1948) (acknowledging that Article 22 precludes prosecutorial comment suggesting an adverse inference to be drawn from the defendant's failure to testify, but concluding that no improper comment had been made in that instance); *Smith v. State ("Smith I")*, 169 Md. 474, 476, 182 A. 287 (1936) (noting that the prosecutor's closing remarks contravened defendant's constitutional privilege against self-incrimination afforded by Article 22). *Cf. Guy v. State*, 90 Md. 29, 33–35, 44 A. 997 (1899); *Brashears v. State*, 58 Md. 563, 567–69 (1882). Presently, a defendant's privilege against self-incrimination is protected by the Fifth Amendment to the United States Constitution,[10] Article 22 of the Maryland Declaration of Rights,[11] and Section 9–107 of the Courts and Judicial Proceedings Article of the Maryland Code.[12]

 Notwithstanding Maryland's long history, a prosecutor may summarize the evidence admitted at trial and additionally comment on its qualitative and quantitative significance. *See Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707 (1974). Indeed, "[a]ttorneys are [ordinarily] afforded great leeway in presenting" opening statements and closing arguments to the jury. *See id.* at 410, 326 A.2d 707; *Degren v. State*, 352 Md. 400, 429, 722 A.2d 887 (1999) (citations

---

10. The Fifth Amendment to the United State Constitution states, in pertinent part, that "no person shall ... be compelled in any criminal case to be a witness against himself...." U.S. CONST. amend. V.

11. Article 22 of the Maryland Declaration of Rights provides "[t]hat no man ought to be compelled to give evidence against himself in a criminal case." MD. CONST., Decl. of Rights, art. 22.

12. Section 9–107 of the Courts and Judicial Proceedings Article, entitled, **"Defendant in criminal trial[,]"** declares that "[a] person may not be compelled to testify in violation of his privilege against self-incrimination. The failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him." Md.Code (1974, 2013 Repl.Vol.), § 9–107 of the Courts and Judicial Proceedings Article (emphasis in original).

omitted). Therefore, a prosecuting attorney may attempt to assist the jury in analyzing evidence by presenting a comprehensive picture, and is generally free to "comment legitimately and speak fully, although harshly, on the accused's actions and conduct if the evidence supports his comments[.]" *Wilhelm,* 272 Md. at 404, 326 A.2d 707. However, a prosecutor's comments to the jury are *not* unfettered, particularly when the comments run afoul of a defendant's privilege against self-incrimination. *See generally Smith II, supra,* 367 Md. 348, 787 A.2d 152 (2001). If the prosecutor's remarks are fairly and reasonably susceptible of the inference by the jury to consider the defendant's silence as indicative of his or her guilt, the commentary is improper and requires reversal unless proven harmless beyond a reasonable doubt. *Smith II,* 367 Md. at 354, 356 n. 6, 787 A.2d 152 (quoting *Smith I,* 169 Md. at 476, 182 A. 287).

It matters not that the prosecutor's challenged remarks were direct or indirect. Rather, we look at the context in which the contended remarks were made. *See, e.g., Smith II,* 367 Md. at 359–60, 787 A.2d 152; *Oken v. State,* 343 Md. 256, 295, 681 A.2d 30 (1996); *King, supra,* 190 Md. at 373–74, 58 A.2d 663; *Grace v. State,* 6 Md.App. 520, 522–23, 252 A.2d 297 (1969); *Sizemore v. State,* 5 Md.App. 507, 518–19, 248 A.2d 417 (1969). We objectively consider whether the prosecutor's comments outwardly conveyed or clearly evinced an intent to reference the defendant's silence. *See, e.g., Marshall v. State,* 415 Md. 248, 263–64, 999 A.2d 1029 (2010) (concluding that the prosecutor's statements that the defendant "did not take the stand" and that the jury did not have the benefit of the defendant's thoughts, were clearly used to highlight the defendant's silence and to use the silence as support for the State's case); *Smith II,* 367 Md. at 360, 787 A.2d 152 (holding that the "prosecutor went beyond the permissible comment on the absence of the evidence, and impermissibly commented directly on the defendant's failure to testify" when the prosecutor argued that the defendant provided no explanation regarding his acquisition of stolen goods); *Woodson v. State,* 325 Md. 251, 267, 600 A.2d 420 (1992) (observing that the prosecutor's

remarks during closing were improper when he indicated that the State had kept its promise by providing the jury with evidence and that the defendant had not, demonstrating a sharp contrast that implied guilt from the defendant's silence); *Veney v. State*, 251 Md. 159, 179–80, 246 A.2d 608 (1968) (concluding the prosecutor's comments merely implied that the State's propounded evidence was uncontroverted). *Cf. Littreal v. Redwine*, 252 Md. 662, 667, 250 A.2d 894 (1969) (concluding that the attorney's "argument cannot be said to have constituted a forbidden comment on the failure of the defendant[ ] to testify[,]" because "[h]e merely reviewed certain testimony and added, truthfully, that there was no evidence in contradiction.") (citation omitted).

■ Additionally, we evaluate whether the challenged remarks, viewed within the context of the entire argument, are directed more at the general weakness of the defendant's defense rather than the defendant's failure to testify. *Compare Oken v. State*, 343 Md. at 295, 681 A.2d 30, *and King*, 190 Md. at 373–74, 58 A.2d 663, *with Marshall v. State*, 415 Md. at 263–64, 999 A.2d 1029, *and Smith II*, 367 Md. at 360, 787 A.2d 152. In that regard, we assess whether a *reasonable* juror would have interpreted the prosecutor's remarks as an invitation to draw a negative inference from the defendant's silence. *See, e.g., Marshall*, 415 Md. at 264, 999 A.2d 1029. Other jurisdictions employing the fairly or reasonably susceptible of the inference test characterize the test similarly. *See, e.g., Rodriguez v. State*, 753 So.2d 29, 37–39 (Fla.2000) (*per curiam*) (recognizing the distinctions between a prosecutor's impermissible comments on the defendant's silence and comments on the evidence of the case); *Moore v. State*, 669 N.E.2d 733, 739 (Ind.1996) (examining the challenged statements in the context in which they were made and determining that the prosecutor's inadvertent reference to the defendant's failure to testify did not cause a reasonable jury to infer guilt from the defendant's silence); *Commonwealth v. Feroli*, 407 Mass. 405, 553 N.E.2d 934, 937 (1990) (observing that a prosecutor is entitled to emphasize the strong points of the government's case and the weakness of the defendant's, even

if it prompts some collateral or passing reflection on the defendant's failure to testify, because the "challenged remark referred principally to the strength of the Commonwealth's case"); *Davis v. State,* 685 N.E.2d 1095, 1098 (Ind.Ct.App. 1997) (observing that even a prosecutor's direct comment on a defendant's failure to testify will not require the reversal of a conviction as long as the comment could not have reasonably been interpreted by the jury as a suggestion to infer guilt from the defendant's silence) (citing *Moore, supra,* 669 N.E.2d at 739); *Commonwealth v. Buzzell,* 53 Mass.App.Ct. 362, 759 N.E.2d 344, 348–51 (2002) (indicating that the reviewing court assesses the remarks in context, and observing that a comment characterizing the evidence as being uncontested or undisputed is erroneous if the only thing that could refute such an argument is an explanation from the defendant).

██ It is insufficient that the language remotely might be construed as an allusion to the defendant's silence. Therefore, unless the prosecutor's comments are such that a jury would naturally and necessarily believe them to be an invitation to draw an adverse inference from the defendant's failure to testify, the remarks are not prejudicially unfair. *Smith II,* 367 Md. 348, 363–66, 787 A.2d 152 (Battaglia, J., concurring in judgment). *See also Commonwealth v. Grant,* 418 Mass. 76, 634 N.E.2d 565, 570 (1994); *Buzzell,* 759 N.E.2d at 349. The Court of Appeals' decisions in *Smith II* and *Marshall, supra,* illustrate this analysis, and present examples of commentary of such a nature that the juries were naturally and necessarily invited to draw an inference of guilt from the defendant's silence.

██ In *Smith II,* the defendant, Smith, was charged with the burglary and theft of leather goods from a home. 367 Md. at 351–52, 787 A.2d 152. He was tried by jury in the Circuit Court for Caroline County, presenting neither evidence nor his own testimonial explanation regarding the acquisition of the stolen property. *Id.* at 352, 787 A.2d 152. During the State's closing argument, the prosecutor challenged the jury

to consider the lack of evidence justifying Smith's possession of the stolen property, stating:

> The Judge has said that you can look backwards in this case. Look to see who ends up with the property and then you can work backwards and here if the recent unexplained possession of stolen property allows you to work backwards to conclude, ["H]ey, this guy was the thief, this guy was the burglarer.["] In making that conclusion, ask yourself this[: *"]What explanation has been given to us by the defendant* for having the leather goods?["] Zero, none.

*Id.* at 352, 787 A.2d 152 (emphasis in original). Smith's counsel objected to the last comment, but the trial court overruled the objection. Smith was subsequently convicted of first degree burglary, conspiracy to obstruct justice, malicious destruction of property, and four counts of theft.[13] *Id.* He noted an appeal to this Court, and we affirmed the judgment below. *Id.*

Reversing our judgment, the Court of Appeals concluded that the prosecutor's comments were fairly and reasonably susceptible to the adverse inference of guilt because, from the reasonable juror's perspective, the prosecutor "effectively suggested that the defendant had an obligation to testify at trial." *Id.* at 359, 787 A.2d 152 (citing *Mitchell v. United States*, 526 U.S. 314, 330, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), and *Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)). By remarking that the defendant had failed to provide any explanation regarding the acquisition of the stolen property, the prosecutor called the jury's attention to the absence of evidence that only the defendant's testimony could supply, thereby shifting the burden of proof to

---

**13.** *See* Md.Code (2002, 2012 Repl.Vol.), §§ 6–202 ("burglary in the first degree"), 6–301 ("malicious destruction"), & 7–104 through 7–107 ("theft") of the Criminal Law Article for statutory definitions of the crimes noted, *supra.* The inchoate crime of conspiracy, however, is a common law offense, "the gist of conspiracy is the entering into of the illegal scheme [obstruction of justice as provided by Md.Code (2002, 2012 Repl.Vol.), § 9–306 of the Criminal Law Article], and once this occurs, the crime is complete without the doing of an overt act." *Price v. State*, 4 Md.App. 701, 704, 244 A.2d 900 (1968).

Smith and nullifying his right to the presumption of innocence. *Id.* at 359–60, 787 A.2d 152.

More recently, the Court of Appeals encountered a similar issue in *Marshall v. State*, 415 Md. 248, 999 A.2d 1029 (2010). There, defense counsel argued during closing that the State had failed to meet its burden of proof demonstrating that the defendant had distributed as opposed to "simply" purchased cocaine. *Id.* at 253, 999 A.2d 1029. To that end, the defense argued that the State failed to present any evidence definitively tying Marshall to the house in which both he and the cocaine were discovered. *Id.* In response, the prosecuting attorney rebutted that

> ... [w]hile the State might not have introduced evidence definitely linking ... Marshall to the home, there [was] no evidence that definitively link[ed] or unlink[ed] him to the home.[ ]

*Id.* at 254, 999 A.2d 1029.

Marshall's counsel objected, arguing that the State's rebuttal had shifted the burden. *Id.* at 255, 999 A.2d 1029. The prosecutor, however, continued attacking Marshall's position, arguing that Marshall's counsel had testified on his behalf. *Id.* He indicated that the defense attorney

> [ ]was testifying and drawing his own conclusions that ... Marshall was buying drugs. And ... that there [wa]s not a piece of evidence ... indicat[ing] that ... Marshall was there purchasing drugs....

The prosecutor continued, adding that

> [ ][Defense counsel] himself said that, again testifying for ... Marshall, he said he's a cocaine addict. *Now,* ... *Marshall did not take the stand* so I ask you to take that with a great deal of caution when [defense counsel] tries to indicate a health problem for ... Marshall because there's no evidence of that whatsoever.
>
> \* \* \*
>
> [ ]What [defense counsel] is trying to do, he is trying to create doubt in your mind. He's trying to disguise the

facts, make you ignore the facts and shroud what's right before you. The State has presented ample evidence of . . . Marshall's guilt as to felony . . . *There is no doubt in my mind to that* . . . [.]

[ ]A very fair way to explain . . . reasonable doubt is if you imagine you're doing a jigsaw puzzle . . . But regardless at some point as you're putting together your jigsaw puzzle, without ever having seen the picture, you will know what the picture is before all the pieces are in place. You will know . . . what the picture is even though you don't have all the pieces.

[ ]There are several pieces we don't have. *We don't have . . . Marshall's thoughts[,]* but we do have so many other pieces and when you put those pieces together, they spell out guilty.[ ]

*Marshall, supra,* 415 Md. at 255–56, 999 A.2d 1029 (additions, in part, in original) (emphasis in original).

Marshall's counsel moved for mistrial on two grounds. *Id.* at 256, 999 A.2d 1029. First, he asserted that "[t]wice during the State's closing, [the prosecutor] pointed to the fact [his] client [had not] testif[ied.]" Marshall's attorney further articulated that the remarks were fairly and reasonably susceptible of the adverse inference of defendant's guilt. *Id.* The circuit court, however, denied Marshall's motion, finding that the prosecutor's remarks were mere "rhetorical flourish." *Id.* at 256, 999 A.2d 1029. Marshall was found guilty of possession of cocaine and possession of cocaine with the intent to distribute.[14] *Id.* at 251, 257, 999 A.2d 1029. A panel of this Court affirmed the judgment of the circuit court in an unreported opinion, concluding that while the prosecutor's remarks were a comment regarding Marshall's silence, they "were a satisfactorily tailored 'invited response[ ]' " to defense counsel's closing argument. *Id.* at 257, 999 A.2d 1029. Thereafter, Marshall

---

14. *See* Md.Code (2002, 2012 Repl.Vol.), §§ 5–601 & 5–602 of the Criminal Law Article (entitled "**Possessing or administering controlled dangerous substance[,]**" and "**Distributing, possessing with intent to distribute, or dispensing controlled dangerous substance.**") (emphasis in original).

petitioned the Court of Appeals for a writ of certiorari, which the Court granted. *Id.* (citing *Marshall v. State,* 404 Md. 658, 948 A.2d 70 (2008)).

Upon the Court's contextual review of the record, it concluded that the prosecutor's remarks infringed upon Marshall's privilege against self-incrimination, guaranteed by Article 22 of the Maryland Declaration of Rights [15] and Section 9–107 of the Courts and Judicial Proceedings Article.[16] *Id.* Reasoning that the prosecutor's remarks were manifestly intended to reference the defendant's silence, the Court specifically observed that the prosecutor's statements to the jury that

"Mr. Marshall did not take the stand" and "[w]e don't have Mr. Marshall's thoughts" were used to highlight the fact that the defendant did not testify in an effort to rebut the State's evidence. [Therefore, t]he prosecuting attorney clearly was using the defendant's silence as support for the State's case.

*Id.* at 263–64, 999 A.2d 1029. Consequently, the Court deduced that the direct reference to Marshall's silence naturally and necessarily invited the jury to draw an adverse inference of guilt. *Id.* Thus, the Court concluded that the prosecutor's comments were improper and constituted reversible error due to the scant evidence directly linking Marshall to the house in which both he and the cocaine had been discovered. *Id.* at 264, 999 A.2d 1029.

Thereafter, the Court rejected the State's argument that the prosecutor's comments, italicized *supra,* fell within a narrow exception of fair responses to impermissible claims of the defense, as recognized by the Supreme Court in *United States v. Robinson,* 485 U.S. 25, 32–34, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).[17] *See also Rodriguez, supra,* 753 So.2d at 39; *Dufour*

---

15. *See* note 11, *supra.*

16. *See* note 12, *supra.*

17. In *United States v. Robinson,* the Supreme Court determined that a prosecutor's comments during summation that the defendant could

*v. State,* 495 So.2d 154, 160–61 (Fla.1986). Rather, the Court held that the prosecutor's comments were not a permissibly invited response because Marshall's counsel had not presented any improper argument in his closing. *Id.* at 257, 267–68, 999 A.2d 1029. Consequently, the Court of Appeals reversed Marshall's conviction and remanded the case for a new trial. *Id.* at 268, 999 A.2d 1029.

The facts in *Smith II* and *Marshall* are inapposite to the case at bar. Unlike the present case, in which we are confronted with the propriety of prosecutorial remarks during opening statement, *Smith II* and *Marshall* pertain to remarks made during closing arguments. *See Marshall,* 415 Md. at 255–56, 999 A.2d 1029; *Smith II,* 367 Md. at 352, 787 A.2d 152. *See also Oken, supra,* 343 Md. at 292–93, 681 A.2d 30; *Woodson, supra,* 325 Md. at 265–66, 600 A.2d 420; *Veney, supra,* 251 Md. at 178, 246 A.2d 608; *Smith I, supra,* 169 Md. at 476, 182 A. 287; *Davis v. State,* 168 Md. 10, 11, 176 A. 281 (1935); *Grace,* 6 Md.App. at 521–22, 252 A.2d 297; *Sizemore,* 5 Md.App. at 518, 248 A.2d 417. *Cf. King, supra,* 190 Md. at 373–74, 58 A.2d 663. Although there is sufficient similarity between allegations regarding the impropriety of prosecutorial remarks at the beginning and at the close of trial to permit the application of common principles generally, "opening statements in a jury trial cannot be equated to closing arguments made to the jury[.]" *Wilhelm, supra,* 272 Md. at 411, 326 A.2d 707. The law is not to be applied in the abstract, but must be considered in light of the facts within each individual

---

have taken the stand and explained his side of the story did not violate the defendant's privilege to be free from compulsory self-incrimination, where the comments followed defense counsel's closing remarks that the Government had not allowed the defendant, who did not testify, to explain his side of the story. 485 U.S. at 31–32, 108 S.Ct. 864. Admittedly, the Court acknowledged that where a prosecutor, on his own initiative, asks the jury to draw an adverse inference from defendant's silence or to treat defendant's silence as substantive evidence of guilt, privilege against compulsory incrimination is violated. *Id.* at 32, 108 S.Ct. 864. Nonetheless, it concluded that where the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his or her counsel, there is no violation. *Id.*

case. *Compare Oken,* 343 Md. at 295, 681 A.2d 30, *and King,* 190 Md. at 373–74, 58 A.2d 663, *with Marshall,* 415 Md. at 263–64, 999 A.2d 1029, *and Smith II,* 367 Md. at 360, 787 A.2d 152. As observed, *supra,* the context of the challenged remarks are essential. Because the case *sub judice* presents a matter of first impression, we turn our attention to sister jurisdictions that have addressed the propriety of prosecutorial remarks made during *voir dire* or opening statement.

We begin our review with the Supreme Court of Nebraska's decision in *State v. Pierce,* 231 Neb. 966, 439 N.W.2d 435 (1989). There, the prosecutor iterated during his opening statement that the defendant, Pierce, would "testify **but we do not know which version of the facts to which he will testify.**" *Id.* at 439 (emphasis added). Defense counsel immediately requested a mistrial, contending that the prosecutor's remarks violated Pierce's privilege against self-incrimination. *Id.* The trial court denied counsel's motion and provided no curative instruction. Pierce was convicted later of criminal mischief. *Id.* at 438–39.

The Supreme Court of Nebraska reversed, concluding that the prosecutor's opening statement compelled Pierce to testify and, therefore, violated of his privilege against self-incrimination. *Id.* at 445. The court preliminarily observed that "a prosecutor's comment concerning the necessity of [a] defendant's testimony or an expression concerning the plausibility or credibility of anticipated testimony from a defendant violates an accused's right to remain silent," because the remarks implicitly shifted the burden upon the defendant to prove his or her innocence. *Id.* at 443–44. It further reasoned that the manifestly intended effect of such remarks was either to coerce Pierce to testify or to induce him to remain silent, "with the knowledge that the jury had been challenged in the outset to observe whether or not he would go upon the stand, under the goad of the prosecutor's statement." *Id.* at 444 (quoting *Coleman v. State,* 111 Ind. 563, 13 N.E. 100, 101 (1887)). Thus, the court found that

[t]he prosecutor's remark immediately made Pierce's credibility an issue in the case before introduction of any

evidence. Moreover, the prosecutor's remark presented a dilemma: Pierce could remain silent and thereby give credence to, or even substantiate, the invidious innuendo that he had previously given inconsistent versions of the incident on which the criminal charge was based, or Pierce could take the witness stand and recount a version without any inconsistency, thereby responding to the prosecutor's intimation of inconsistency but subjecting himself to cross-examination. If Pierce failed to take the stand, the jury might conclude that his silence buttressed the prosecutor's remark about Pierce's multiple versions of the incident, that is, Pierce did not have a consistent credible account of the incident and remained silent to avoid entanglement in a web of inconsistency as an indication of guilt. On the other hand, if Pierce did take the stand, but failed to provide an absolutely consistent account of the incident, the jury might indulge in the belief that Pierce's guilt or innocence turned on consistency in Pierce's testimony rather than the State's meeting its burden to prove Pierce's guilty by evidence beyond a reasonable doubt. . . .

*Id.* at 444–45. Accordingly, the court determined that the expression of uncertainty regarding "which version of the facts to which [Pierce] w[ould] testify," *id.* at 439, "informed the jury that Pierce had expressed more than one version or account of the incident in question[,]" and insinuated that Pierce, at one point, admitted his criminality in the charged offense. *Id.* at 445. This implication, the court believed, was of such a nature that it naturally and necessarily invited the jury to believe that an adverse inference was to be drawn from Pierce's silence. *Id.* Thus, the court set aside Pierce's conviction for criminal mischief. *Id.*

Nine years later, the Mississippi Court of Appeals addressed the propriety of a prosecutor's opening statements in *Leflore v. State,* where the prosecutor began his opening statement by outlining for the jury the witnesses he intended to call. 726 So.2d 261, 262 (Miss.Ct.App.1998). Thereafter, however, he remarked that it would likely be a short case because defense counsel likely would call only the defendant,

Leflore, to testify on her own behalf. *Id.* Leflore's attorney objected to the prosecutor's comment, arguing that such a comment violated her privilege against self-incrimination. *Id.* At the trial court's behest, the prosecutor explained to the jury that he only assumed that Leflore was going to testify, that she was under no obligation to testify, and that no inference should be drawn from her failure to testify. *Id.* The court reiterated the prosecutor's advisory comments, further instructing the jury that Leflore's silence could not be considered during deliberation. *Id.* Nonetheless, the jury ultimately found Leflore guilty, and she subsequently sought reversal of her conviction for felony shoplifting before the intermediate appellate court. *Id.* at 262–63.

Before the court, she argued that the prosecutor's opening remarks were analogous to a constitutionally impermissible comment on a defendant's failure to testify. *Id.* at 263. The court, however, rejected Leflore's argument and concluded that the prosecutor's comments were not prejudicial. *Id.* Specifically, the court noted a definite distinction between Leflore's characterization of the challenged statement and what the prosecutor actually said. *Id.* It concluded that "the prosecutor was not commenting on Leflore's failure to testify but on the likelihood that she would." *Id.* Thus, the court distinguished the facts presented in Leflore's case from those presented in *Pierce, supra,* and held that prosecutor's remarks had neither placed Leflore's credibility at issue before the presentation of any evidence nor compelled her to testify. *Id.* In addition, the intermediate appellate court observed that even if the prosecutor's comments had prejudiced Leflore, the trial court had provided instruction on her right to the presumption of innocence, the State's burden in proving guilt beyond a reasonable doubt, and the prohibition against drawing any inference from her silence, thereby nullifying any remote possibility of harm. *Id.* Therefore, the court concluded that the prosecutor's remarks were not fairly and reasonably susceptible to the inference by the jury to adversely consider Leflore's silence as indicative of her guilt. *See id.*

In 2000, the Court of Appeals of Virginia considered the propriety of remarks rendered during a *voir dire* examination of the jury venirepersons in *Hazel v. Commonwealth,* 31 Va.App. 403, 524 S.E.2d 134 (2000). There, the prosecutor posed the following four questions:

[PROSECUTOR]: And, as the [c]ourt advised you, the defendant has no burden to produce any evidence in this case. And, he has a fundamental and Constitutional Right not to testify if he chooses not to and that is not to be held against him nor are you to draw any adverse inferences from he's [sic] choosing not to testify. Does everyone agree with that?

AFFIRMATIVE JURY PANEL RESPONSE

[PROSECUTOR]: And, if the defendant does not or chooses not to testify, does everyone agree that you would not hold that against him this case?

AFFIRMATIVE JURY PANEL RESPONSE

[PROSECUTOR]: But, if the defendant were to testify in this case, does everyone feel that you can weigh his testimony with equal footing with any other witness that you would hear in this trial?

AFFIRMATIVE JURY PANEL RESPONSE

[PROSECUTOR]: **And, if the defendant were to testify and were to say that he didn't do it or it was an accident, do you feel that would automatically create reasonable doubt in your mind by that statement alone?**

NEGATIVE RESPONSE

*Id.* at 136 (emphasis added).

Hazel moved for mistrial, contending that the prosecutor improperly commented on his privilege against self-incrimination. *Id.* Hazel additionally argued that the prosecutor's questions to the venire "improperly called upon the jury to consider whether they would be more or less likely to believe him if he testified." *Id.* The trial court, however, denied Hazel's motion, finding that, although the prosecutor's "questions were 'ill advised,' the questions were sufficiently 'balanced' and did not prejudice the defendant." *Id.* at 137.

Much like the *Pierce* court, the Virginia Court of Appeals, reversed the judgment below and remanded the case for further proceedings. *Id.* at 136, 139. The intermediate appellate court reasoned that the prosecutor's questions "infringed upon" Hazel's right to silence because the questions challenged Hazel to testify "or to face ... possible negative implications[.]" *Id.* at 139 (citing *State v. Lindsey*, 578 S.W.2d 903, 904 (Mo.1979)). The prosecutor's questions effectively removed Hazel's right to the presumption of innocence by asking the jury to consider both Hazel's actions and inactions as insufficient to create a reasonable doubt to overcome a finding of guilt, thereby impermissibly shifting the burden of proof to Hazel. *Id.* Thus, the court concluded that the prosecutor's remarks violated Hazel's right to silence, were not harmless, and that the trial court erred by denying his motion for mistrial. *Id.*

The District of Columbia Court of Appeals addressed the permissibility of a prosecutor's remarks in the consolidated decision of *Pérez v. United States*, 968 A.2d 39 (D.C.2009).[18] There, the prosecutor described for the jury testimony they would hear from the defendants' accomplice, José Benítez ("Benítez"), who was originally charged as a codefendant but subsequently pled guilty and testified at trial against his former fellow gang members. *Id.* at 53 n. 1, 79. Specifically, the prosecutor noted that Benítez

> ... w[ould] tell [the jury] he participated in the assault of [the victim]. But ... Benítez, unlike all of these other men, ha[d] taken responsibility for his crime. He[ ] [had] pled guilty. And whatever [anyone] want[ed] to call him, a plea agreement witness or a snitch, whatever [anyone] want[ed] to call him, [he] w[ould] be called to the stand.

---

18. The District of Columbia Court of Appeals consolidated the appeals of Luis Adonay Pérez, Carlos Alberto Robles–Benevides, Santos Felipe Bonilla, José Roberto Salamanca, and Oscar Villatoro, which all challenged convictions rising out of a brutal murder and various assaults in which an unidentified homeless man was beaten and a passerby who intervened to stop the beating of the homeless man was beaten and stabbed to death. *Pérez*, 968 A.2d at 39, 52.

*Id.* at 79. Counsel for Peréz, Robles–Benevides, and Villatoro raised no objection to the remarks, and the court subsequently recessed. *Id.*

The trial court later advised that the remarks were "dangerously close to a comment on the right of the defendants to put on no evidence and to not testify," and offered to provide a curative instruction to the jury. *Id.* Defense counsel declined, instead moving for mistrial. *Id.* The court denied the motion, finding that the prosecutor's comment was merely a " 'passing remark' that would not 'deprive anybody of a fair trial.' " *Id.* The defendants were ultimately convicted of conspiracy [19] to assault [20] and to commit murder [21] and of first degree premeditated murder while armed.[22] *Id.* at 56–7.

On appeal, the defendants argued, among other things,[23] that the prosecutorial remarks violated the defendant's consti-

---

19. *See* D.C. Code § 22–1805a (2009) ("conspiracy to commit a crime")

20. *See* D.C. Code §§ 22–401 through 22–404 (1995) (providing the varying degrees of assault).

21. *See* D.C. Code § 22–2101 (2001) ("murder in the first degree— purposeful killing")

22. *See id.*

23. Indeed, Pérez, Robles–Benevides, Bonilla, Salamanca, and Villatoro collectively presented eight claims on appeal. *Pérez,* 968 A.2d at 52. Specifically, the defendants argued:

... (1) the government abused the grand jury system to intimidate alleged eyewitnesses and suborned perjured testimony favorable to the government; (2) the government violated their right to due process by not disclosing to defense counsel evidence and witnesses that could have undermined the credibility of government witnesses; (3) the trial court improperly admitted hearsay statements in a joint trial under the exception for statements against penal interests; (4) the trial court should have granted their request for severance because they were prejudiced by being tried jointly; (5) the prosecutor engaged in improper argument by alluding to the fact that the defendants would not testify, by using inflammatory language and by making references to the defendants' gang membership; (6) the trial court improperly refused to grant a mistrial because some of the jurors were biased against them; (7) the trial court improperly denied the ... motions of two of the appellants, whose counsel, they claim, were constitutionally ineffective; and (8) the aiding and abet-

tutional guarantee to silence. *Id.* at 79. The government conceded that the comments were ill-conceived, but argued that they were not unduly prejudicial. *See id.* at 79–80. The appellate court agreed. *Id.* at 80. Although the court recognized that the prosecutor's opening statement contained commentary directly related to the defendants' guilt, it determined that the commentary manifestly appeared "to [be] intended primarily to encourage the jury to trust Benítez's testimony even though he had participated" in the crimes for which the defendants stood trial. *Id.* The court was mindful that opening statements and closing arguments

> are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Id.* (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

The court also noted the fact that the challenged remarks were made " 'not during the trial ... but in an opening statement,' and [were] not repeated later, may itself tend to mitigate any [remote allegation of] prejudice.' " *Id.* (quoting *Munn v. United States,* 703 A.2d 1239, 1241 (D.C.1997), and *Owens v. United States,* 497 A.2d 1086, 1092 (D.C.1985)). Further, even if the prosecutor's comments during opening statement had naturally and necessarily caused the jury to draw an adverse inference, however remote the possibility, the appellate court was satisfied that any prejudice was counterbalanced by the trial judge's two renditions of standard jury

---

ting instruction ... held erroneous in *Wilson–Bey* [*v. United States,* 903 A.2d 818 (D.C.2006) ] was given to the jury in their trial and tainted their conviction for first-degree murder.
*Id.*

instructions at the beginning and end of trial, "reminding jurors that [the defendants] had 'an absolute right not to testify' and that the law did not require the defendants to prove their innocence or produce any evidence." *Id.* at 81. Therefore, the court concluded that the prosecutor's comments during opening statement neither violated the defendants' right against self-incrimination nor resulted in substantial prejudice. *Id.*[24]

Most recently, the United States Court of Appeals for the Third Circuit discussed the rectitude of opening remarks in *United States v. Pawlowski,* where the prosecutor voiced the following remarks before the jury:

Mr. Pawlowski [the defendant] is absolutely entitled to a fair trial, and he will have a fair trial. Please remember that the burden of proof is on the prosecution, as it should be, in a criminal case. **And [the defense] will certainly present evidence and explain things** and bring up, make good points that will help you understand the evidence better.

682 F.3d 205, 208 (3d Cir.2012) (emphasis in original).

The defendant raised no objection to this or any part of the government's opening statement. *Id.* Alternatively, at the close of the defendant's opening statement, defense counsel responded directly to the prosecutor's remarks. *Id.* Defense

---

**24.** The District of Columbia Court of Appeals, however, did reverse the first-degree murder convictions of Robles–Benevides, Bonilla, and Villatoro, and remanded the case to the trial court with instructions to vacate their convictions and resentence the defendants for murder in the second degree. *Pérez,* 968 A.2d at 52. Its decision was predicated upon the conclusion that the trial court's erroneous aiding and abetting instruction constituted plain error that allowed the jury to convict defendants first-degree murder while armed without finding the necessary *mens rea* for the charged crime. *Id.* at 101–02, 105.

Unlike his codefendants, Pérez did not submit a supplemental brief challenging his first-degree murder conviction on the same basis. *Id.* at 105. Therefore, the court declined to reverse his conviction in the absence of any briefing on the issue. *Id.* Nonetheless, the court found that "the trial court, may, after hearing from the parties, determine whether [Pérez's] conviction should be reversed in the interest of justice, without imposing a bar of cause and prejudice." *Id.* at 106.

counsel clarified for the jury that the defendant had no duty to offer evidence at trial, arguing:

> Now, Mr. Prosecutor Haller, excuse me, **Assistant United States Attorney, indicated that I am going to put evidence on, and I am sure that was a misstatement. I have no duty to put any evidence on. Trust me, there will be some zealous cross-examination, however, and I am going to submit to you all of the evidence is right here.** It is the chats. It is the phone conversations.[25] What other evidence is there? The government wants you to look at the evidence and believe [that the defendant is guilty beyond a reasonable doubt]. [The d]efense wants you to look at the evidence and believe [that he is not guilty]. It is that simple.

*Id.* at 208–09 (emphasis added).

At the close of all evidence, the United States District Court for the Western District of Pennsylvania charged the jury with its final instructions. *Id.* at 209. The United States District Court explained Pawlowski's constitutional privilege against self-incrimination and reiterated, in part:

> The burden of proof is always on the government and it must prove guilt beyond a reasonable doubt. This burden never shifts to a defendant because the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.

*Id.* The jury subsequently found Pawlowski guilty of attempted enticement of a minor, in violation of 18 U.S.C. § 2422(b) (2006).[26] Pawlowski noted an appeal to the Third Circuit,

---

**25.** Pawlowski had been charged and was placed on trial for one-count of attempted enticement of a minor, pursuant to 18 U.S.C. § 2422(b) (2006). *Id.* at 208. *See* note 26, *infra*, for the specific language of Section 2422(b).

**26.** Title 18, Section 2422 of the United States Code provides, in relevant part:

> (b) Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, en-

presenting three arguments to the intermediate appellate court.[27] *Id.* at 207. Most notably, he averred that the prosecutor's comments during opening statements violated his privilege against self-incrimination by inviting the jury to consider his silence as demonstrative of guilt, thereby constituting plain error. *Id.* at 207, 210.

The Third Circuit disagreed. *Id.* at 207, 210–11. After examining the challenged remark, the court determined that the prosecutor's brief and isolated remark was neither unduly prejudicial nor plain error. *Id.* at 210. The court observed that "[t]he District Court repeatedly explained to the jury that the government bore the burden of proof and that Pawlowski had an absolute constitutional right not to testify or present evidence." *Id.* More importantly, the court additionally reasoned that defense counsel's direct response to the government's opening remarks within his opening statement cured *any* potential misimpression the jury may have developed. *Id.* at 210–11. Therefore, it concluded that the comments during opening statements were not fairly and reasonably susceptible of the inference by the jury to adversely consider Pawlowski's silence as illustrative of his guilt. *See id.* at 210–11.

---

> tices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b) (2006).

**27.** The three arguments Pawlowski raised on appeal are as follows:

> . . . (1) the government's remark that defense counsel would "certainly present evidence" violated his Fifth Amendment rights, (2) the evidence at trial was insufficient to prove that he believed he was communicating with a minor, and (3) the District Court miscalculated his Sentencing Guidelines range because masturbation does not constitute "sexual contact" for the purposes of the two level enhancement pursuant to [United States Sentencing Guideline] § 2G1.3(b)(4)(A).

*Pawlowski*, 682 F.3d at 207.

**(C) DID THE PROSECUTOR'S REMARKS INVITE AN ADVERSE CONSIDERATION OF DEFENDANT'S SILENCE AS DEMONSTRATIVE OF GUILT?**

From these cases noted *supra,* we glean one essential question that must be addressed in determining whether the challenged remarks made during the State's opening invited the jury to adversely consider a criminal defendant's silence as demonstrative of guilt: "Whether the remarks challenged the defendant to testify or to face the possible negative implications from remaining silent." *See Pérez,* 968 A.2d at 80; *Hazel,* 524 S.E.2d at 139; *Leflore,* 726 So.2d at 263; *Pierce,* 439 N.W.2d at 443–44. *See also Lindsey,* 578 S.W.2d at 904; *Clark v. State,* 256 Ark. 658, 509 S.W.2d 812, 815 (1974). *Cf. State v. Morgan,* 144 Idaho 861, 172 P.3d 1136, 1137, 1139 (Idaho Ct.App.2007). Because this analysis requires an evaluation of the specific context in which the statements were made, we shall consider and balance the following: (1) whether the manifestly intended effect of the comments was to coerce the defendant to testify at trial or induce him or her to remain silent with knowledge that the jury was invited to consider the defendant's silence or testimony, thereby placing the defendant in a Hobson's choice; (2) whether the challenged remarks shifted the burden upon the defendant to prove his or her innocence; and (3) whether the comment was merely a remark on the strength of the State's case. If a balancing of these considerations leads to the conclusion that the challenged statements invited the jury to consider a defendant's silence as demonstrative of guilt, the reviewing court should determine whether the remarks were unduly prejudicial and harmful by considering: (1) whether the remarks were isolated and present only in the opening; (2) whether the defendant sought curative instruction; (3) whether the defense responded directly to the prosecutor's comments, clarifying for the jury that defendant had no burden of proof, was entitled to presumption of innocence until proven guilty beyond a reasonable doubt, and maintained a fundamental privilege against self-incrimination; and (4) whether the trial court adequately provided clear instruction

regarding the defendant's right to the presumption of innocence and the defendant's right to silence. *See Pawlowski,* 682 F.3d at 210–11; *Pérez,* 968 A.2d at 80; *Hazel,* 524 S.E.2d at 136; *Leflore,* 726 So.2d at 262. *Cf. Pierce,* 439 N.W.2d at 439.

Our evaluation of the record and consideration of the above-referenced inquiry leads to our conclusion that the statements in the case *sub judice* were not fairly and reasonably susceptible of the inference by the jury to adversely consider appellant's silence as demonstrative of his guilt. To be sure, her statements were problematic, but the prosecutor was not commenting on appellant's failure to testify nor challenging him to testify or to face the possible negative implications from his silence. The prosecutor stated that she would bring in witnesses "to corroborate everything that the Defendant has said," suggesting that the evidence in the form of appellant's "own words" had already been memorialized before trial. There was no explicit reference to the necessity of appellant's testimony or any statement that could be seen as questioning the validity of any anticipated testimony. *Contra Pierce,* 439 N.W.2d at 439 (concluding it was improper for the prosecutor to argue that defendant "will testify but we don't know which version of the facts to which he will testify"); *State v. Turner,* 433 A.2d 397, 400 (Me.1981) (noting that the prosecutor improperly appealed to the jury to consider the deficiencies in the defendant's case that would remain unaddressed if the defendant failed to testify where the prosecutor argued "[t]he defendant will surely try to raise doubts in your mind as to who was driving when it struck [the victim]"); *Clark,* 509 S.W.2d at 813 (concluding that it was improper for a prosecutor in a murder case to argue, "If you notice, I'm here by myself, and this vacant chair. He might be here to tell his side[,] but he's not here. The story then that you will have about what happened out there will come from [the defendant]. . . ."). Rather, she merely inartfully summarized the evidence the State intended to offer at trial and commented on its qualitative and quantitative significance. *Wilhelm, supra,* 272 Md. at 412–43, 326 A.2d 707. *See, e.g., Oken*

*v. State*, 343 Md. at 295, 681 A.2d 30; *King*, 190 Md. at 373–74, 58 A.2d 663; *Pérez*, 968 A.2d at 79–80. *Cf. Frazier v. H. C. Cupp*, 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (concluding that the government had offered "no more than an objective summary of evidence which the prosecutor reasonably expected to produce."). Thus, while the remarks may have been ill-conceived, we find no violation of appellant's right against self-incrimination as guaranteed by the Fifth Amendment, Article 22 of the Maryland Declaration of Rights, and Section 9–107 of the Courts and Judicial Proceedings Article.[28]

Even assuming *arguendo* that the prosecutor's remarks came close to a comment on defendant's privilege against self-incrimination, subsequent to the State's opening statement, appellant's counsel removed any possibility that the comments would be misinterpreted by the jury:

> . . . [W]hat she's referring to is a so-called confession that my client gave.
>
> **But if you've listened to that presentation where she said it's not a who-done-it case, we know he did it, he admitted everything; then forget it, forget about asking any questions, forget about your oath to listen to the evidence before you render a decision—because then something's gone terribly wrong, because my client, William Siam Simpson, III, sits here before you with the presumption of innocence, and it is the State's job to prove beyond a reasonable doubt that he's guilty.**
>
> **And, ladies and gentlemen, until they've done that, you must assume that he's not guilty, that he is not—that he's innocent.**

(emphasis added). *Cf. Pawlowski*, 682 F.3d at 208–09.

Therefore, no rational juror could subsequently interpret the prosecutor's opening statement as a promise that appellant would, in fact, testify at trial, or that his failure to do required the jury to make a negative inference from his

---

**28.** *See* notes 9, 10, & 11, *supra.*

silence. "The trial judge was in the most advantageous position to evaluate any potential prejudice from the remark. . . . If in the trial environment [the court] had sensed the likelihood of any prejudice [it] would have carried out the duty with which [it] was entrusted—under *Contee* [*v. State*, 223 Md. 575, 165 A.2d 889 (1960) ]—and of which [the judge] was certainly aware—to instruct the jury to disregard such remark; the exigencies of the situation did not appear to [the court] to require such a cautionary instruction" at that time. *Wilhelm*, 272 Md. at 436–37, 326 A.2d 707.

Moreover, at the close of trial, the circuit court charged the jury with instructions that emphasized the presumption of appellant's innocence and the State's burden in proving his guilt beyond a reasonable doubt:

> The [appellant] is presumed to be innocent of the charges. This presumption remains with the [appellant] throughout every stage of the trial and it's not overcome unless you are convinced beyond a reasonable doubt that the [appellant] is guilty.

> The State has the burden of proving the guilt of the [appellant] beyond a reasonable doubt. This burden remains on the State throughout the trial. The [appellant] is not required to prove his innocence.

The court's instructions explicitly advised the jury that "[o]pening statements and closing arguments . . . are not evidence[, and that] . . . [t]hey [we]re intended only to help [the jury] understand the evidence and apply the law." The jury is presumed to follow these instructions. *Wilhelm*, 272 Md. at 423–24, 326 A.2d 707. "[I]t does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced at trial." *Frazier*, 394 U.S. at 736, 89 S.Ct. 1420. Indeed, " 'it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately.' " *Id.* (quoting *United States v. Socony–Vacu-*

*um Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)).

The circuit court's instructions also cautioned the jury against the possibility of any negative inferences to be drawn from appellant's silence:

> The [appellant] has an absolute constitutional right not to testify. The fact that the [appellant] did not testify must not be held against the [appellant]. It must not be considered by you in any way or even discussed by you.

Yet even after the court's cautionary instruction, it was *appellant's* counsel who returned to an attack of the State's opening remarks, reaffirming that the prosecutor's comments related *specifically to appellant's post-arrest confession.* Accordingly, we conclude that the court committed no error in its refusal to grant appellant's motion for mistrial.

### (D) The Testimony of Officer Robert Kaleda.

As its final witness, the State called Officer Robert Kaleda ("Investigator Kaleda"), a fireman "with collateral duties as an accelerant canine detection handler" with the Office of the Fire Marshal. The State began its examination by discussing the training of Investigator Kaleda and his canine partner, Joy, in the following dialogue:

> [THE STATE]: Okay. And have you and Joy received any training in the identification and detection of accelerants?
>
> [INVESTIGATOR KALEDA]: Yes.
>
> [THE STATE]: All right. And please describe that training for the jury.
>
> [INVESTIGATOR KALEDA]: The initial training is in Front Royal, Virginia, at the Bureau of Alcohol, Tobacco and Firearms Canine Academy. It's a six-week long program. And the dogs are trained with repetitive scents, and they're rewarded, and that's their training process.
>
> [THE STATE]: Describe what kind—when you said that they're repetitive scents, describe what the—well, would you describe that training that you would go through?

[INVESTIGATOR KALEDA]: Okay. The initial training is pretty much cans, similar to these, and there is substances put in the cans. Some have odor on them and some do not. And when I say "odor," of hydrocarbon-based fuel. The dog repetitively goes over them hundreds of times a day to distinguish between the products and the products with fuel.

[THE STATE]: And about how many hours of training have you received with regards [sic] to identification and detection?

[INVESTIGATOR KALEDA]: Initially?

[THE STATE]: Yes.

[INVESTIGATOR KALEDA]: From the—initially, in the five, six weeks? Or from that, then on? Do you mean cumulative?

[THE STATE]: Well, why don't you tell me a little bit about your education and training as a fire investigator at the department[?]

[INVESTIGATOR KALEDA]: Okay. I'm a nationally certified fire investigator with the national qualification board. I've been assigned there since 1998. I've probably investigated well over 100 fires. Joy and I have probably done—investigated, well over 100 scenes, all throughout the [S]tate of Maryland.

[THE STATE]: And with regards [sic] to your training, and I guess, being a canine handler, what is that like?

Can you describe that, what training that you had to undergo to have a canine partner such as Joy?

[INVESTIGATOR KALEDA]: The training is—like I said, it's in Front Royal, at the Canine Academy. It's really—the dogs are—when we receive the dogs, they are already imprinted, which is the process of where they are trained to the odors. They know that before we get there. They, indeed, have—and the ATF training staff does that for about 8 weeks, I believe, before we get there. So our six-week program is just pretty much acclimating, and being able to learn how to distinguish what the dog is doing.

[THE STATE]: Okay. And that's the training that you received?

[INVESTIGATOR KALEDA]: Yes, ma'am.

Subsequent to this line of inquiry, the State questioned Investigator Kaleda about his ability to interpret Joy's actions and the two's communicative ability:

[THE STATE]: Okay. And how is it that you know—well, describe for the jury what, exactly, Joy does when you are—when you two go out to investigate fires?

[OFFICER KALEDA]: Joy is a—she's a good, good dog. She—I give her a command to seek when we go to work, and she—obviously, she sniffs, and when she does that, she—her behavior will change when she gets in the area of an odor, and she will sniff more rapidly, she'll move around a little more quickly.

When she finds the highest concentration of odor, she will sit and she'll put her nose on it, and then she'll be fed. I will ask her to show me the location and she'll put her nose on the highest concentration of odor.

Thereafter, the State proceeded to question Officer Kaleda regarding the canine scan that he and Joy performed at appellant's home. Officer Kaleda recounted the process by which he and Joy began conducting an exterior search of appellant's vehicle and Joy's subsequent alert to accelerants. This prompted an objection by appellant's counsel, and the following colloquy ensued:

[INVESTIGATOR KALEDA]: Yes, ma'am. I started at the left front fender, and went around the vehicle 360 degrees, pointing to locations that I wanted her to search, and she had two positive alerts.

[THE STATE]: Where were those positive alerts?

[APPELLANT'S COUNSEL]: Object, Your Honor. May we approach?

THE COURT: Sure.

(Counsel approached the bench and the following ensued)

[APPELLANT'S COUNSEL]: Your Honor, first, I know that we had a discussion before, but I want to renew my objection to this witness testifying as an expert witness effectively without having been properly qualified.

I think under [*State v.*]*Blackwell*[, 408 Md. 677, 971 A.2d 296 (2009) ] the court made it clear, that if anyone is going to testify based upon special training and experience, that you have to qualify them as an expert. Otherwise, they are limited to the facts.

This witness, we were never notified that this witness was an expert. I have a notice of expert witnesses, and that's William Murray, Brandon Goff, and Andrew Hawkins.

Your Honor, we object on the grounds that he was never disclosed as an expert witness, he has never been qualified; and[,] therefore, he should not be permitted to give testimony now as an expert witness.

THE COURT: Anything else?

[APPELLANT'S COUNSEL]: No, Your Honor. Except that, if you overrule the objection—and it seems like you're about to do that—then I would ask to have a standing objection, so I don't have to keep—and that's for any testimony that he gives regarding alerts or his conclusions.

The circuit court overruled appellant's objection, but granted him a standing objection to Investigator Kaleda's testimony.

On appeal, appellant contends that the trial court erred when it overruled his objection to testimony by Investigator Kaleda regarding his observations of a canine that had been trained to detect the presence of fire accelerants. Specifically, he asserts that because Investigator Kaleda was neither identified as an expert witness prior to trial nor accepted as an expert at trial pursuant to Maryland Rules 4–263 and 5–702, that his testimony regarding his canine partner's alerts should have been excluded.

Responding to appellant's contentions, the State argues that "[b]ecause Officer Kaleda's testimony[,] as to his observations of [the canine,] was neither opinion testimony nor expert testimony, [appellant's] claims must be rejected." Further,

the State avers that "[e]ven if this Court determines that Officer Kaleda's testimony constituted not only opinion testimony, but also expert testimony under Rule 5–702, [appellant's] conviction should nonetheless be affirmed because any error in its admission was harmless in nature." Although we conclude that it was error to admit Officer Kaleda's testimony, its admission was harmless beyond a reasonable doubt.

The Court of Appeals' opinion in *Ragland v. State* makes clear that Maryland "Rules 5–701 [29] and 5–702 [30] prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." 385 Md. 706, 725, 870 A.2d 609 (2005), *quoted in State v. Blackwell,* 408 Md. 677, 690, 971 A.2d 296 (2009). *Accord Payne v. State,* 211 Md.App. 220, 240, 65 A.3d 154 (2013); *Coleman–Fuller v. State,* 192 Md.App. 577, 619, 995 A.2d 985 (2010); *Wilder v. State,* 191 Md.App. 319, 362, 991 A.2d 172 (2010). Therefore, it is error for the circuit court to admit lay opinion testimony based upon specialized knowledge, skill, experience, training, or education when the State has failed to classify it as expert testimony and to provide the defense "[r]eports or statements of experts[,]" and "the expert's name and address, the subject matter of the consultation, the substance of the expert's findings and opinions, and a summary of the grounds for each opinion" without any necessity of the defendant's request. Md. Rule 4–263(d)(8)(A). *See*

---

**29.** Maryland Rule 5–701, entitled, "Opinion testimony by lay witness," provides that "[i]f the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Md. Rule 5–701.

**30.** Maryland Rule 5–702, entitled, "Testimony by experts," additionally states that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." Md. Rule 5–702.

*Ragland,* 385 Md. at 716, 870 A.2d 609. "The purpose of th[ese] Rule[s] [are] to assist the defendant in preparing his or her defense and to protect the defendant from surprise." *Ragland,* 385 Md. at 717, 870 A.2d 609. *See also Hutchins v. State,* 339 Md. 466, 473, 663 A.2d 1281 (1995).

The question we must resolve is whether Officer Kaleda's testimony at trial regarding his observations of a canine that had been trained to detect the presence of fire accelerants is expert testimony within the meaning of Maryland Rule 5–702. As a consequence, we turn our attention to the prior decisions of Maryland's courts that have evaluated the distinctions between lay and expert testimony *infra.* We begin by reviewing the Court of Appeals' watershed opinion in *Ragland v. State,* 385 Md. 706, 870 A.2d 609 (2005) (overruling of the Court's prior holding in *Robinson v. State,* 348 Md. 104, 702 A.2d 741 (1997)).

In *Ragland v. State,* the Court of Appeals was asked to consider whether it was error to admit the lay opinion testimony of two police officers who had concluded that a particular series of events had constituted a drug transaction based on their training and experience. 385 Md. at 709, 870 A.2d 609. There, the two officers had witnessed an alleged drug transaction involving the defendant, Ragland, although neither had recovered any contraband from him. *Id.* at 709–10, 870 A.2d 609. At Ragland's trial, the first officer testified that he received training in the investigation of drug crimes through several drug recognition courses and seminars. *Id.* at 711–12, 870 A.2d 609. It was upon this experience that the first officer testified that Ragland had been involved in a drug transaction. *Id.* at 712, 870 A.2d 609. The second officer additionally testified that, based on his prior training and experience, Ragland was involved in a drug transaction. *Id.* at 714, 870 A.2d 609. Ragland's counsel interposed several objections to each of the officers' testimonies, arguing that the officers had testified as experts without the defense receiving notice that the officers would be offering expert testimony. *Id.* at 712–13, 870 A.2d 609. The circuit court overruled the objections of defense counsel, perceiving that the officers'

testimonies constituted lay opinions. *Id.* at 712, 870 A.2d 609 [31] Ragland was ultimately convicted of distribution of a controlled dangerous substance.[32] Thereafter, he noted a timely appeal to this Court. *Id.* at 715, 870 A.2d 609. Before we could consider the case, however, the Court of Appeals issued a writ of *certiorari* on its own initiative. *Id.* (citing *Ragland v. State,* 382 Md. 688, 856 A.2d 724 (2004)).

The Court considered whether the officers' testimonies constituted lay opinion testimony under Md. Rule 5–701 or expert testimony under Md. Rule 5–702. *Ragland,* 385 Md. at 717–19, 870 A.2d 609. The Court recognized that the bisection between lay and expert opinion testimony is imperfect "because at least one class of opinions potentially falls within both categories." *Id.* at 718, 870 A.2d 609. The Court noted that, in some instances, "[a] witness who has personally observed a given event may nonetheless have developed opinions about it that are based on that witness's specialized knowledge, skill, experience, training, or education." *Id.* Consequently, it held that "Md. Rules 5–701 and 5–702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Id.* at 725, 870 A.2d 609. In so holding, the Court recognized that "by permitting testimony based on specialized knowledge, education, or skill under ... Md. Rule 5–701 [the rule governing lay opinion

---

**31.** The following discussion ensued at the bench regarding the testimony of the first officer:

[DEFENSE COUNSEL]: Your Honor, I've not received any notice that anyone other than the chemist is testifying as an expert. What the State is trying to elicit is an opinion based upon training and experience in narcotic-in investigating narcotics crimes.

THE COURT: Well, he's not-he's not asking him an opinion question, I think Mr. [Prosecutor]—

[PROSECUTOR]: Yes. It's not an expert opinion. That's what we elicited at the start, is that he brings to this like a mechanic who works on Mercedes, brings special knowledge about Mercedes. He brings special knowledge about drug deals and what these things bring. So I'm asking him what's his opinion of what occurred.

THE COURT: I'm going to permit the answer over objection.

*Ragland,* 385 Md. at 712, 870 A.2d 609.

**32.** *See* note 14, *supra.*

testimony [33]], parties may avoid the notice and discovery requirements of [the Maryland Rules] and blur the distinction between" the rules governing expert and lay opinion testimony. *Id.* Accordingly, the Court deduced that the circuit court's admission of the officers' testimonies without satisfying of Md. Rules 5–702 and 4–263(d)(8)(A) was an abuse of discretion because the officers' testimonies were based on their specialized knowledge, experience, and training in narcotics transactions and recovery. *Id.* at 726, 870 A.2d 609. Further, the Court concluded that the circuit court's admission of the officers' testimonies was not harmless beyond a reasonable doubt, because the primary witness against Ragland was the second officer and because the State had relied, in large part, on the officers' opinion testimonies to establish that the events that they had witnessed were, in fact, the drug transaction for which Ragland was charged. *Id.* at 726–27, 870 A.2d 609. Thus, the Court reversed the judgment of the circuit court and remanded the case for new trial. *Id.* at 727, 870 A.2d 609.

More recently, the Court of Appeals considered whether an officer's testimony regarding the administration and observations of a horizontal gaze nystagmus ("HGN") test to a defendant convicted of, among other things, driving a vehicle while under the influence of alcohol [34] in *State v. Blackwell,* 408 Md. 677, 971 A.2d 296 (2009). At Blackwell's trial before the Circuit Court for St. Mary's County, the State's sole witness was Maryland State Trooper Jeffrey Linger ("Trooper Linger"), who stopped the vehicle Blackwell was operating on the morning we was arrested for the charged offenses. *Id.* at 681, 971 A.2d 296. Trooper Linger attested that, after stopping Blackwell, he administered two of three field sobriety tests on the defendant: the HGN and walk-and-turn tests. *Id.* at 681–82, 971 A.2d 296.[35] During the State's direct

---

33. *See* note 29, *supra.*

34. *See* Md.Code (1977, 2012 Repl.Vol.), § 21–902 of the Transportation Article.

35. Trooper Linger testified that the third of the three field sobriety tests that is generally administered is the one-legged stand test, *Blackwell,*

examination of Trooper Linger, defense counsel objected to the officer's description of and conclusions reached from Blackwell's performance on the HGN test, which were overruled by the court. *Id.* at 682–84, 971 A.2d 296. At the conclusion of trial, the jury returned a verdict of guilty. *Id.* at 685, 971 A.2d 296.

Blackwell appealed his convictions to this Court. *Id.* Relying on *Ragland, supra,* a panel of this court reasoned that Trooper Linger's testimony regarding the HGB test was expert testimony "because it was based upon the officer's specialized knowledge and training." *Id.* at 685–86, 971 A.2d 296. Thus, we reversed Blackwell's convictions regarding the alcohol-related offenses, concluding that "the trial court erred in admitting Trooper Linger's testimony without having him qualified as an expert [pursuant to Md. Rule 5–702]." *Id.* at 686, 971 A.2d 296 (additions in *Blackwell,* 408 Md. at 686, 971 A.2d 296). The State filed a petition for writ of certiorari to the Court of Appeals, which was granted. *Id.*

Applying the rule of *Ragland,* the Court of Appeals affirmed the judgment of this Court, concluding that the officer's "testimony about Blackwell's performance on the HGN test constituted expert testimony subject to the strictures of Md. Rule 5–702." *Id.* at 691, 971 A.2d 296. In reaching its conclusion, the Court noted that

[the officer] reported, among other things, that Blackwell had "lack of smooth pursuit" and "distinct nystagmus at maximum deviation" in each eye. This testimony was not based upon [the officer's] general knowledge as a layperson but upon his specialized knowledge and training. **To be sure, the HGN test is a scientific test, and a layperson would not necessarily know that "distinct nystagmus at maximum deviation" is an indicator of drunkenness; nor could a lay person take that measurement with any accuracy or reliability.**

---

408 Md. at 682, 971 A.2d 296, but because Blackwell had injured his leg during the walk-and-turn test, he did not administer the test. *Id.* at 685, 971 A.2d 296.

*Id.* (emphasis added). In addition, the Court rejected the State's assertion that Md. Rule 5–702 was "inapplicable because [the officer] did not expressly provide an opinion 'as to Blackwell's state of intoxication,'" noting that Md. Rule 5–702 provides that "[e]xpert testimony may be admitted . . . in the form of an opinion *or otherwise* . . . ." *Id.* at 693, 971 A.2d 296 (internal citation omitted) (emphasis in original). The Court observed that

> **[w]hen an expert describes firsthand observations in court, this basis testimony is generally still a form of expert testimony.** Like ordinary percipient witnesses, such experts are reporting direct sense impressions. Unlike the nonexpert witness, however, **the ability to make these observations in the first place typically requires expertise.** A treating physician's description of symptoms, a fingerprint examiner's testimony about similarities or differences between two prints he has examined, or an engineer's description of what he observed when examining the prior art in a patent dispute are all examples of observational testimony that requires specialized knowledge. **A lay observer of the same injuries, fingerprints, or inventions would lack either the vocabulary to describe what she saw with precision or the knowledge of which observation mattered.**

*Id.* (citing DAVID H. KAYE ET AL., THE NEW WIGMORE: EXPERT EVIDENCE, § 3.2.1 (2004)) (emphasis added). As a consequence, the Court determined that "[m]uch like the doctor's description of symptoms, or the fingerprint examiner's testimony about the similarities or differences between two prints he had examined—both subjects of expert evidence—" the officer's observational testimony was based on specialized knowledge and experience and, therefore, expert testimony, because the average juror would not have known the correlation between alcohol consumption and HGN. *Id.* at 693–94, 971 A.2d 296.

Subsequent to the Court of Appeals' decision in *Blackwell,* this Court considered whether an officer's testimony relying on the use of cellular phone records and additional cellular

technology constitutes expert testimony and, accordingly, requires adherence of Md. Rules 4–263(d)(3), 4–263(d)(8)(A), and 5–702. *See Payne v. State,* 211 Md.App. 220, 231, 65 A.3d 154 (2013); *Coleman–Fuller v. State,* 192 Md.App. 577, 612, 995 A.2d 985 (2010); *Wilder,* 191 Md.App. 319, 347, 991 A.2d 172 (2010). In these instances, we observed that the officer's testimony was based on specialized training, and therefore concluded that the officer "was required to be qualified as an expert and, as such, the State was, accordingly, also required to fulfill its discovery obligations[,]" provided by the Maryland Rules. *Coleman–Fuller,* 192 Md.App. at 619, 995 A.2d 985. *See also Wilder,* 191 Md.App. at 368, 991 A.2d 172 ("The trial court ought not have permitted [the officer] to offer lay opinion testimony about the cell site location, and to describe the map created based on the cellular telephone records.").

Nonetheless, Maryland's appellate courts have never considered whether the testimony of an officer's observations of his/her detection canine qualifies as expert testimony and, therefore, requires adherence of Md. Rules 4–263(d)(3), 4–263(d)(8)(A), and 5–702. We conclude that it does, and therefore requires adherence to the Maryland Rules. *Cf. Roberts v. State,* 298 Md. 261, 269, 469 A.2d 442 (1983); *Terrell v. State,* 3 Md.App. 340, 348, 239 A.2d 128 (1968); *State v. Schultz,* 58 P.3d 879, 883 (Utah Ct.App.2002); *Fones v. State,* 765 So.2d 849, 850 (Fla.Dist.Ct.App.2000); *Carr v. State,* 267 Ga. 701, 482 S.E.2d 314, 317 (1997); *State v. Buller,* 517 N.W.2d 711, 714 (Iowa 1994). Admittedly, Maryland's discussion regarding the admissibility of a canine alert or canine tracking and identification of a suspect is particularly scant. Even so, we find this Court's prior discussions regarding the issue instructive to our assessment of the case at bar.

In *Terrell v. State,* this Court undertook an exhaustive survey of the law concerning a "portion of American folklore" dealing with the ability of a dog trained to follow the human scent to track down a fugitive. 3 Md.App. 340, 239 A.2d 128 (1968). Among the State's witnesses at Terrell's trial were Officer Fred Helton ("Officer Helton"), an officer of the K–9 Corps, and Terence P. Cahill ("Cahill"), a qualified expert in

training dogs for use by law enforcement agencies. *Id.* at 343–44, 239 A.2d 128. Both witnesses discussed, at length, their training and expertise in the area of dog handling as well as the rigorous training of the tracking canine, Rocky, that had tracked the defendant to a Plymouth automobile where he was apprehended. *Id.* at 342–44, 239 A.2d 128. Officer Helton and Cahill's testimony was admitted at trial over Terrell's objection. *Id.* at 341, 239 A.2d 128. At the close of trial, Terrell was convicted of robbery. *Id.*[36]

Before this Court, Terrell averred that his conviction for robbery required reversal because the circuit court improperly admitted evidence concerning the tracking by a dog trained to follow human scent. *Id.* In reaching our conclusion that the circuit court had committed no error in admitting the evidence of dog tracking, *id.* at 358, 239 A.2d 128, we partook in a detailed evaluation of the long-known recognition of trained dogs to follow a human's trail and noted "[t]hat the ability of a dog to follow the human scent is not an inherent characteristic, but one that must be instilled into the animal through arduous training." *Id.* at 344, 239 A.2d 128. Thus, we concluded that testimony about the tracking of a fugitive may be admitted so long as a proper foundation regarding the qualifications of both the dog and the handler must be laid. *Id.* at 349, 353, 239 A.2d 128. Specifically, we noted that

> [b]efore any evidence pertaining to the results of the dog's tracking [may be] admitted, the handler of the dog must testify as to his own qualifications and experience and that of the dog, along with an account of the dog's ability to track.

*Id.* at 349, 239 A.2d 128. We noted that upon a proper foundation, "the evidence may be used to identify the accused as the perpetrator or for some other reason, as long as this evidence is corroborated." *Id.* at 353, 239 A.2d 128. We observed, however, that in laying the evidentiary foundation

---

**36.** *See* Md.Code (2002, 2012 Repl.Vol.), §§ 3–401 through 3–403 of the Criminal Law Article, providing definitions and penalties under Title 3, Subtitle 4, entitled "Robbery."

"it is not the dog but the handler who reports the dog's behavior, training, and ability," because its is the "trainer [who] stays with the dogs [and, therefore,] testifies as to his own observations." *Id.* at 355–56, 239 A.2d 128. As a consequence, we concluded that because the handler and trainer are the responsible parties controlling the dog and **able to interpret the dog's actions,** it is the trainer or handler who should be examined. *Id.* at 355, 239 A.2d 128. *See also Roberts v. State,* 298 Md. 261, 269, 469 A.2d 442 (1983) (observing prior to the admission of a so-called "dog lineup," the circuit judge initially concluded that the tracking canine, "Sniffer," had demonstrated reliability in tracking and that his handler was qualified to interpret the dog's actions).

 Because the ability of a dog to alert to accelerants or other contraband "is not an inherent characteristic, but one that must be instilled into the animal through arduous training," *Cf. Terrell,* 3 Md.App. at 344, 239 A.2d 128, and because the canine's handler must be qualified to interpret the dog's actions signifying an alert, *see id.* at 355, 239 A.2d 128, we conclude the testimony of an officer's observations of his or her detection canine qualifies as expert testimony and, therefore, requires adherence of Md. Rules 4–263(d)(3), 4–263(d)(8)(A), and 5–702. *See State v. Buller,* 517 N.W.2d 711, 713 (Iowa 1994) (concluding that "[e]vidence of the reaction at fire scene of a dog trained in accelerant detection is a type of specialized information that will assist a trier of fact."). Therefore, it was error to admit Officer Kaleda's testimony.

 However, we perceive this as harmless error rather than grounds for reversal of appellant's convictions. "A defendant in a criminal case is entitled to a fair trial, but not necessarily a perfect one." *Gutierrez v. State,* 423 Md. 476, 499, 32 A.3d 2 (2011) (concluding that, notwithstanding the circuit court's erroneous admission of expert testimony in contravention of Md. Rule 5–702 and 4–263(d)(8)(A), the error was harmless predicated on a comprehensive review of the record therein) (citing *Hook v. State,* 315 Md. 25, 36, 553 A.2d 233 (1989)). We are mindful that

when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) (footnote omitted), *quoted in Gutierrez,* 423 Md. at 500, 32 A.3d 2. *See also Blackwell,* 408 Md. at 697–98, 971 A.2d 296. "Looking to the other evidence on the record, we are confident that the statement would not have persuaded the jury to render a guilty verdict when it would not have otherwise done so." *Gutierrez,* 423 Md. at 500, 32 A.3d 2. As noted in Parts I and II(A), *supra,* appellant signed a detailed confession in which he admitted to committing the crime at issue a mere few hours after the incident's occurrence. The confession provided both details regarding how he committed the criminal conduct but also his motive for committing it. In addition, the confession provided, with particularity, the style of shoe appellant was wearing during the incident of May 16, 2010. Appellant's description of the shoes he wore matched a pair of black and gray Nike athletic shoes located in appellant's closet. Further, diagnostics performed on both shoes confirmed the presence of ignitable liquids. *See* Part I n. 6, *supra.*

Indeed, even appellant's counsel noted during his opening statement, there was ample corroborative evidence to support appellant's connection to the charged crime resulting in a guilty verdict. Appellant's attempt to burn Ms. Byers' vehicle was recorded on video. Further, Mr. Byers, Ms. Byers, and Jasmine Byers were all conclusively able to identify appellant by his posture and distinctive strut and had observed him on the surveillance video. More importantly, however, appellant's post-arrest statement accurately reflected the event depicted in the video recording and as described by the Byers at trial. Moreover, admission of Officer Kaleda's testimony

did not run counter to the purpose of the rule in *Ragland:* "to assist the defendant in preparing his or her defense and to protect the defendant from surprise." 385 Md. at 717, 870 A.2d 609. Indeed, appellant acknowledged during his opening that "all of the[ ] witnesses have testified before" and were previously subject to cross-examination. Thus, appellant could hardly argue that the admission of Officer Kaleda's testimony was unduly prejudicial. Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**